UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Case No. 05-22409-Civ-Seitz/McAliley

BARBARA COLOMAR, On Behalf of Herself
and All Others Similarly Situated,

      Plaintiff,

vs.

MERCY HOSPITAL, INC. and
CATHOLIC HEALTH EAST, INC.,

      Defendants.

_____/



## DEFENDANT MERCY HOSPITAL, INC.'S MOTION TO DISMISS AND INCORPORATED MEMORANDUM OF LAW

Pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, Defendant Mercy

Hospital, Inc. ("Mercy") hereby moves to dismiss the Class Action Complaint ("Complaint")

filed by Plaintiff Barbara Colomar. The Plaintiff's Complaint is premised on the theory that

Mercy breached an agreement with the Plaintiff and is engaged in unfair and deceptive

trade practices because it discounts its rates for insured patients and patients who receive

Medicare or Medicaid, and does not always provide discounts to its uninsured patients who

do not qualify for Medicare or Medicaid.[1] As courts across the country have recognized

in other similar lawsuits, the Plaintiff cannot prevail on her claims because Mercy has not

---

[1] In fact, Mercy foregoes *any* payment from uninsured patients who demonstrate the financial inability to pay. The Plaintiff told Mercy that she was insured, *see* Compl. at Ex. A ("Insurance Information"), and never sought eligibility for charity care. The accompanying Affidavit of David Keebler, Mercy's Director of Patient Access, explains Mercy's long-standing commitment to charity care for the uninsured. (A true and correct copy of Mr. Keebler's Affidavit is attached as Exhibit A.) While the Court need not consider this affidavit to decide the plain legal infirmities of the Complaint, the Court may elect to do so and decide this motion under Rule 56 of the Federal Rules of Civil Procedure.

KENNY NACHWALTER, P.A.



breached any legal obligation to the Plaintiff. Additionally, the relief the Plaintiff seeks should be requested from the legislature or at the administrative level, not from the courts.

As discussed in more detail below, the Plaintiff's Complaint fails to state a claim for the following reasons:

- The Plaintiff is not contractually or otherwise entitled to the discounted rates she seeks for the care she received at Mercy Hospital.

- The Plaintiff has not established and cannot establish that Mercy Hospital's rates were unreasonable as a matter of law or fact.

- The Plaintiff's claims are precluded because she has already agreed with Mercy to pay her charges in installments and has continuously made partial payments pursuant to that agreement.

- The Plaintiff cannot state a claim under FDUTPA[2] because the lack of a discount does not render Mercy's charges fraudulent or deceptive under the Florida statute.

- The FDUTPA claim is subject to a statutory exception and therefore should be dismissed.

Mercy's incorporated memorandum of authorities sets forth Mercy's legal and factual arguments on each of these points.

### Factual Allegations and Procedural History

The Plaintiff, Barbara Colomar, was admitted to Mercy Hospital in Miami, Florida, on March 5, 2003, and discharged on the following day. Compl. at ¶ 1. She sought emergency room treatment after she developed shortness of breath when she was exposed to pesticides in her home. Compl. at ¶ 1. Upon the Plaintiff's admission, Mercy

---

[2] The Florida Deceptive and Unfair Trade Practices Act ("FDUTPA") is codified at Fla. Stat. § 501.201, *et seq.*

KENNY NACHWALTER, P.A.

administered a chest x-ray, ventilation/perfusion lung scan, and an EKG to the Plaintiff and treated her with steroids, oxygen, and respiratory therapy. Compl. at ¶ 33.

At the time she sought treatment from Mercy, the Plaintiff did not qualify for Medicaid or Medicare and, as it turned out, did not have health insurance. Compl. at ¶ 1. The Plaintiff was billed $12,863.00 for her treatment at Mercy. Compl. at ¶ 34. She has made payments totaling $1,750.00, and the balance is in collection. Compl. at ¶ 34.[3]

The Plaintiff signed a Consent to Treatment Form when she was admitted to Mercy. The Plaintiff focuses on the part of the form that provides:

> I/we authorize and direct payment of the Hospital Benefits arising from insurance or other coverage through which the patient is insured or covered, and any and all other proceeds from any insurance and/or settlement or judgment arising out of a claim or lawsuit, directly to Mercy Hospital, but not to exceed the Hospital's regular charges for the services provided. I understand that I am responsible for all charges not paid through the above sources and the [sic] need not seek payment from the above sources.

Compl. at ¶ 15. According to the Plaintiff, this form is misleading because it does not identify what the "charges" will be, contains a reference to "regular charges," does not disclose that uninsured patients are charged higher, (i.e., undiscounted), rates, and must be signed by the patient in a "deceptive and confusing" context. Compl. at ¶ 16. The Plaintiff also claims that when patients do not complete their payments, as she has failed to do, the hospital pursues them through "aggressive collection efforts." Compl. at ¶ 18.

---

[3] The Plaintiff does not dispute that she was appropriately treated and discharged in good health. Her only complaint is with the undiscounted rates that she was charged. Thus, it is noteworthy that the Plaintiff, within hours of her discharge, sought admission to another local non-profit hospital, Baptist Hospital, complaining of the same ailment for which she had been treated at Mercy. She then sued Baptist Hospital on nearly identical allegations, claiming that Baptist Hospital overcharged her by using undiscounted rates. On February 23, 2005, Judge Adalberto Jordan dismissed the Plaintiff's claims against Baptist Hospital. *See Sabeta et al. v. Baptist Hospital of Miami, Inc.*, United States District Court, Southern District of Florida, Case No. 04-21437-Civ-Jordan/Brown (D.E. 86).

KENNY NACHWALTER, P.A.

She does not explain what the allegedly "aggressive" efforts entail – she merely alleges that she was sent copies of her bill and "collection letters" – nor does she state how she has been injured by Mercy's attempts to collect payment from her. Compl. at ¶ 35.

The Plaintiff contends that Mercy charges private insurance companies and governmental third-party payors less than uninsured patients, who are charged "grossly inflated rates." Compl. at ¶ 3. Through the legislative process, programs such as Medicare and Medicaid have come into being, covering specific patient populations and limiting the amount hospitals are paid for treating those patients. Insurance companies are able to negotiate discounts from Mercy through their bargaining efforts. Compl. at ¶ 5. In her Complaint, the Plaintiff quotes Attorneys General and Congressional debate over these pricing issues and the political and social implications of charging undiscounted rates to uninsured patients. See, e.g., Compl. at ¶¶ 10, 11, 13, 14.

On July 19, 2005, the Plaintiff filed a three-count Class Action Complaint against the Defendants in Miami-Dade County, Florida, Circuit Court, on behalf of herself and all other similarly situated individuals. The Defendants removed the action to this Court on September 2, 2005, based on diversity subject matter jurisdiction.

Count I of the Complaint is for breach of contract, i.e., the initial patient intake form ("Consent to Treatment Form"), that required the Plaintiff to be "responsible for all charges." Compl. at ¶ 55. The Plaintiff contends that the reference in the patient intake form to "regular charges" and the absence of any specific pricing information on the form create an obligation for Mercy to charge the Plaintiff no more than the discounted rates charged to insured patients. Compl. at ¶ 55. According to the Plaintiff, Mercy failed to disclose to the Plaintiff the fact that she would be charged undiscounted rates, and thus

KENNY NACHWALTER, P.A.

led her to believe that she would be charged rates commensurate with the discounted rates charged to insured patients. Compl. at ¶¶ 56, 59. In Count II, the Plaintiff claims that Mercy has violated FDUTPA. She contends Mercy's practice of charging undiscounted rates to uninsured patients constitutes an unfair trade practice. She also claims that Mercy's initial patient intake form, alleged acts of concealment with regard to pricing, and collection practices violate FDUTPA. In Count III, the Plaintiff seeks injunctive/declaratory relief for the alleged breach of contract and unfair trade practices.[4]

## Standard for Motion to Dismiss

When ruling on a motion to dismiss pursuant to Rule 12(b)(6) for failure to state a claim, the Court must accept the pleaded facts as true and resolve them in the light most favorable to the plaintiff. *Hoffend v. Villa*, 261 F.3d 1148, 1150 (11th Cir. 2001). If "no construction of the factual allegations will support the cause of action, dismissal of the complaint is appropriate." *Florida Evergreen Foliage v. E.I. DuPont De Nemours & Co.*, 336 F. Supp. 2d 1239, 1252 (S.D. Fla. 2004) (citations omitted).

## Analysis

This case is one of several similar lawsuits that have been filed by uninsured patients in state and federal courts around the country against non-profit hospitals and hospital groups. Like the plaintiffs in the other parallel lawsuits, the Plaintiff here bases her claims on the theory that the undiscounted rates she was charged by Mercy as an uninsured patient are unreasonable because they are significantly greater than the

---

[4] The Plaintiff separately alleges that Mercy's rates bear no relationship to the actual cost of providing the medical services. Compl. at ¶ 59. Even if it were true, that allegation was at most relevant to the now-jettisoned claim that non-profit hospitals are violating their federal tax-exempt status. That claim has been repeatedly dismissed by federal courts around the country, *see infra* note 5 at p. 6, and has not been re-alleged in this case.

KENNY NACHWALTER, P.A.

discounted rates charged to insured, Medicare, or Medicaid patients. In short, the Plaintiff seeks to have this Court give her the same or similar pricing arrangement with Mercy that large volume third-party payors have negotiated for their insureds and/or to have this Court give her the same rights that the legislature saw fit to give the specific patient populations covered by Medicare and Medicaid programs. District courts have overwhelmingly rejected this invitation to create new contractual obligations between the parties and/or to expand government programs beyond their designated beneficiaries, and thus have dismissed other plaintiffs' claims in similar lawsuits.[5]

In one such dismissal, a district court recently observed, "None of the courts across the country that have been presented with cases containing allegations similar to those plaintiffs present here has ruled for the plaintiffs on any substantive legal issue." *Burton v. William Beaumont Hosp.*, 373 F. Supp. 2d 707, 712 (E.D. Mich. 2005). Another court described these cases generally as "bootless actions" where plaintiffs argue, "without any basis in law, that private non-profit hospitals are required to provide free or reduced-rate services to uninsured persons." *Kolari v. New York Presbyterian Hospital*, No. Civ. 7573LAP, 2005 WL 710452 *1 (S.D.N.Y. Mar. 29, 2005).

Courts consistently have recognized that the problem with the plaintiffs' theory of recovery in all of these cases is that it presents a challenge to healthcare policy in general, a challenge that should be addressed to the legislature, not the courts. As one court

---

[5] *See, e.g., Nash v. Lee Mem. Health Sys.*, No. 204CV369FTM, 2005 WL 2043642 (M.D. Fla. Aug. 25, 2005); *Jakubiec v. Sacred Heart Health Sys., Inc.*, No. 04CV274MCR/MD, 2005 WL 1261443 *1 n.4 (N.D. Fla. May 27, 2005) (noting that motions to dismiss were granted in twenty-five other similar cases). State courts have also dismissed these claims. *See, e.g., Nygaard v. Sioux Valley Hosp.*, Case No. CIV 05-391 (S.D. Cir. Ct. Sept. 15, 2005); *Cox v. Athens Regional Med. Ctr.*, Case No. SU-04-CV-261-S (Ga. Super Ct. Jul. 21, 2005). (Copies of these decisions are attached as Exhibit B.)

stated, "Plaintiffs here have lost their way; they need to consult a map or a compass or a Constitution because Plaintiffs have come to the judicial branch for relief that may be granted by the legislative branch." *Kolari* at *1; *see also Burton*, 373 F. Supp. 2d at 712, 724 (quoting *Kolari* and stating, "Plaintiff's participation in the nationwide attack on charity care at non-for-profit hospitals . . . is an attempt to correct a perceived social shortfall. Plaintiffs, however have chosen the wrong forum. . . .").

Like other plaintiffs who have asserted claims based upon their uninsured status, the Plaintiff here is seeking relief in the wrong forum. Moreover, she has not and cannot allege any legally cognizable claim under her theory of recovery. As a result, her Complaint should be dismissed in its entirety.

**I.    Count I: Breach of Contract**

**A.    The Plaintiff Is Not Contractually or Otherwise Entitled to the Discounted Rates She Seeks.**

The Plaintiff premises her claims on the theory that she is entitled to the same or similarly discounted rates that third-party payors receive, yet she has pled no factual support for her position. The Plaintiff's flawed premise is particularly apparent in her breach of contract claim based on the Consent to Treatment Form that she signed. Conspicuously absent from that agreement is any mention of discounted rates for patients who do not receive third-party payor benefits. In fact, the opposite is true, as the Consent to Treatment Form makes the Plaintiff responsible for "all charges" without qualification.

The Plaintiff claims that the following reference to "regular charges" in the Consent to Treatment Form signed by every admitted patient (whether or not insured) is a reference to the discounted rates charged to insured patients:

KENNY NACHWALTER, P.A.

> I/we authorize and direct payment of the Hospital Benefits arising from insurance or other coverage through which the patient is insured or covered, and any and all other proceeds from any insurance and/or settlement or judgment arising out of a claim or lawsuit, directly to Mercy Hospital, **but not to exceed the Hospital's regular charges** for the services provided. I understand that I am responsible for all charges not paid through the above sources and the [sic] need not seek payment from the above sources.

Compl. at ¶ 15 and Ex. A (emphasis added).   The Plaintiff's reading of "regular charges" is irreconcilable with the actual text.  Logically, "regular charges" can refer only to the hospital's one set of undiscounted charges, which the Plaintiff refers to as "Chargemaster" prices. Compl. at ¶ 5.  Discounted charges are inherently *irregular*.  Unlike the so-called "Chargemaster" prices, discounted charges vary from insurance plan to insurance plan, program to program, and contract to contract (as insurers re-negotiate their specific discounts with Mercy with each contract renewal).  Mercy's regular charges are the starting point for its negotiations with third-party payors, and thus the only charges that conceivably qualify as "regular."  Indeed, the Plaintiff's "regular rates" theory would lead to the absurd result of having the Court arbitrarily select which of the multiple discounted rates to apply.

Additionally, the highlighted phrase "not to exceed the Hospital's regular charges" is strictly a qualification of the preceding phrase.  The preceding phrase applies to patients who secure payment to Mercy from a third-party source, *e.g.*, insurance.  Thus, even apart from misreading its substance, the Plaintiff has also misread this provision as applying to her situation, when it unambiguously has no application to the uninsured.

Because the Plaintiff's reading of the provision referencing "regular charges" is irreconcilable with the actual text, it is legally insufficient to avoid dismissal of her claims. *See, e.g., Health Application Systems v. Hartford Life & Acc. Ins. Co.*, 381 So.2d 294, 297

8

(Fla. 1st DCA 1980); *Geico Gen. Ins. Co. v. Graci*, 849 So.2d 1196, 1199 (Fla. 4th DCA

2003) (attached contract showed alleged breach was non-existent); *Ginsberg v. Lennar*

*Florida Holdings*, 645 So.2d 490, 494 (Fla. 3d DCA 1994) ("The conclusions of the pleader,

as to the meaning of the exhibits attached to the complaint, are not binding on the court.").

Without any contract provision as support, the Plaintiff ultimately resorts to alleging

that: "[Mercy's] not-for-profit status provides the relevant basis for Plaintiff's statutory and

common law claims." Compl. at ¶ 24. The lack of any basis for imposing contractual

liability on Mercy could not be clearer. There is no law that binds "not-for-profit" institutions

such as Mercy to a different set of contract law principles than the rest of us. Accordingly,

the Plaintiff's breach of contract claim fails as a matter of law and must be dismissed.[6]

## B.   The Plaintiff Has Not Established That Mercy Hospital's Rates Were Unreasonable As a Matter of Law or Fact.

As an alternative basis for her breach of contract claim, the Plaintiff contends that

Mercy was obligated to charge only reasonable rates. This theory, which is based on an

implied contract term in the Consent to Treatment Form, differs from the "regular charges"

argument, which is based on an explicit contract term that the Plaintiff misreads. Here, the

Plaintiff contends that Mercy's undiscounted rates are inherently unlawful because they

exceed the discounted rates charged to insured, Medicare, and Medicaid patients.

This argument is likewise insufficient, as a matter of law and fact, to establish that

Mercy had a legal obligation to charge the Plaintiff lower rates for its services. Nowhere

---

[6] The Plaintiff unavailingly attempts to misread the Consent to Treatment Form as an "open term" contract, in which pricing terms are left to future good faith negotiations. *E.g.*, Compl. at ¶ 23. Mercy's patient intake forms simply cannot be read as an invitation for patients to negotiate rates of service with Mercy on a patient-by-patient basis. Mercy has set rates for its services, as the Plaintiff knows and concedes. Compl. at ¶ 5.

KENNY NACHWALTER, P.A.

does the Consent to Treatment Form require Mercy to charge a "reasonable" or "fair" rate. Thus, the Plaintiff is again seeking to impose a contractual obligation where no such obligation exists.

A Florida court addressing a very similar issue, moreover, has held that uninsured patients cannot create liability for "unreasonable" pricing, where the patients' alleged complaint is that they did not enjoy the same discounted rates as other injured patients. In *Hillsborough County Hospital Authority v. Fernandez*, 664 So. 2d 1071 (Fla. 2d DCA 1995), the court held that evidence that managed care payors and Medicare, Medicaid, and workers' compensation recipients received discounts was insufficient to prove that a hospital's undiscounted charges were unreasonable. *Id.* at 1071-72; *see also Goble v. Frohman*, 848 So. 2d 406, 410 (Fla. 2d DCA 2003) ("[E]vidence of contractual discounts received by managed care providers is insufficient, standing alone, to prove that nondiscounted medical bills were unreasonable.") (citing *Hillsborough County Hospital Authority*).

While no reported Florida decision has had the opportunity to apply this rule to a breach of contract claim like the one at issue here, *Kolari v. New York Presbyterian Hospital*, No. 04 Civ. 5506, 2005 WL 710452 (S.D.N.Y. Mar. 29, 2005), is on point. *Kolari* is one of the dozens of actions that uninsured plaintiffs have filed against non-profit hospitals in district courts based upon the theory that the hospitals charge uninsured patients higher rates than they charge third-party payors. In *Kolari*, the court dismissed a breach of contract claim nearly identical to the one that the Plaintiff asserts in this case. Like the Plaintiff here, the *Kolari* plaintiffs' only basis for alleging that the hospitals' rates were inflated was a comparison with the rates charged to insurers and Medicare. *Id.* at

10

*10. New York courts also had adopted the rule followed by Florida in *Hillsborough County Hospital Authority*, which holds that a hospital's charges to an uninsured patient are not unreasonable merely because third-party payors are charged a lower price. *Id.*; *see also Huntington Hosp. v. Abrandt*, 779 N.Y.S.2d 891, 892 (App. 2004) ("The fact that lesser amounts for the same services may be accepted from commercial insurers or government programs as payment in full does not indicate that the amounts charged to defendant were not reasonable."); *Flushing Hosp. & Med. Ctr. v. Woytisek*, 364 N.E.2d 1120, 1122 (N.Y. 1977) ("For whatever may be the reasons volume of payments, promptness in paying, assurance of payment or otherwise, Blue Caraways is entitled to what amounts to a very substantial discount with respect to its 50% of the regular charges."); *cf. Burton v. William Beaumont Hosp.*, 373 F. Supp. 2d 707, 718 (E.D. Mich. 2005) (dismissing uninsured patient's breach of contract claim premised on the theory that hospital's rates were unreasonable because it was greater than rate paid by third-party payors).

As another court has explained:

> Although "discounting" of medical bills is a common practice in modern healthcare . . . , it is a consequence of the power wielded by those entities, such as insurance companies, employers and governmental bodies, who pay the bills. . . . While large "consumers" of healthcare such as insurance companies can negotiate favorable rates, those who are uninsured are often charged the full, undiscounted price. . . . In other words, simply because medical bills are often discounted does not mean that the plaintiff is not obligated to pay the billed amount. Defendants may, if they choose, dispute the amount billed as unreasonable, but it does not become so merely because plaintiff's insurance company was able to negotiate a lesser charge.

*Arthur v. Catour*, 803 N.E.2d 647, 649 (Ill. App. 2004). This reasoning applies with equal force here. The only basis alleged for the purported unreasonableness of Mercy's rates

KENNY NACHWALTER, P.A.

is the fact that third-party payors pay discounted rates. As a matter of law and fact, this does not constitute a breach of contract because the alleged disparity does not establish that Mercy's full rates are unreasonable. Thus, the Plaintiff's allegations are insufficient to show that Mercy Hospital breached the Consent to Treatment Form by charging unreasonable amounts. The Plaintiff cannot impose a legal obligation on Mercy to apply the terms of third-party payor agreements concerning discounts where no such obligations exist. Accordingly, the Plaintiff's breach of contract claim must be dismissed.

### C. The Plaintiff's Claims Are Precluded Because She Has Made Partial Voluntary Payments.

The Plaintiff seeks to recover "all economic, monetary, actual, consequential, and compensatory damages" caused by the Defendants' alleged breach. Compl. at ¶ 75. It is unclear what damages the Plaintiff is claiming, but, to the extent she is claiming any payments she already has made as part of her damages, that claim is precluded by the voluntary payment doctrine. The Plaintiff admits to making voluntary partial payments toward the amount owed. Compl. at ¶ 34. These payments were pursuant to her agreement with Mercy to make monthly payments toward the outstanding balance, on which the Plaintiff acknowledges Mercy is *not* charging any interest. *Id.*

Under the voluntary payment doctrine, "money voluntarily paid under a claim of right to the payment, and with knowledge of the facts by the person making the payment, cannot be recovered back, and this is true even though the claim thus paid was illegal...." *Sanchez v. Time Warner, Inc.*, No. 98-211-Civ-T-26A, 1998 WL 834345 *2 (M.D. Fla. Nov. 4, 1998) (quoting *McMullen v. Inland Realty Corp.*, 152 So. 740 (Fla. 1933)); *see also Hassen v. Mediaone of Greater Fla., Inc.*, 751 So. 2d 1289 (Fla. 1st DCA 2000) (stating that voluntary payment of overcharge may bar recovery).

KENNY NACHWALTER, P.A.

The voluntary payment doctrine has been applied to bar class action claims by persons seeking to recover alleged hospital overcharges. In *Hall v. Humana Hospital Daytona Beach*, 686 So. 2d 653 (Fla. 5th DCA 1997), the plaintiffs filed a class action suit to recover alleged hospital overcharges for pharmaceuticals, medical supplies, and laboratory services. *Id.* at 655. The court described the lawsuit as an attack on hospitals' practice of billing sums for items that were disproportionate to the market price of the items in non-hospital settings and therefore unfair and unreasonable. *Id.* The plaintiffs filed an action for money had and received and sought a refund of their overpayments based on a theory of imposition.[7] *Id.* at 656. The court entered summary judgment against the plaintiffs because, in pertinent part, the plaintiffs had voluntarily made payment of the alleged overcharges. *Id.* at 657. Like the plaintiffs in *Hall*, the Plaintiff here has rendered payment to Mercy Hospital voluntarily, and to this point has paid $1,750.00 of her total bill. Compl. at ¶ 34. Having decided to make these payments voluntarily, the Plaintiff is precluded from recovering them or from arguing that Mercy Hospital has exerted undue pressure or advantage to obtain an unreasonable and excessive payment from her. To

---

[7] Imposition requires that a payee "coercively" exact excess money from a payor by taking advantage of its position or the circumstances in which the payor is placed and exact a greater price for services rendered than is fair and reasonable. *Greene v. Alachua Gen. Hosp., Inc.*, 705 So. 2d 953 (Fla. 1st DCA 1998) (citations omitted). It is not clear whether the Plaintiff is pursuing her claims based upon a theory of imposition, but, if she is, she has not alleged facts sufficient to show that Mercy Hospital took advantage of her in any way, nor that she was under pressure greater than that felt by any debtor. *See Greene* at 953 (affirming summary judgment in favor of hospital on plaintiff's claim against hospital for money had and received where plaintiff did not show that he was under pressure greater than any other debtor and where plaintiff voluntarily paid bills); *Hall*, 686 So. 2d at 656 (holding that no imposition existed due to hospital's act of sending patient a bill seeking excessive charges once treatment was completed where act was in violation of agreement to charge only reasonable prices). In any event, the voluntary payment doctrine also bars claims based on imposition. *See id.*

KENNY NACHWALTER, P.A.

the extent that the Plaintiff seeks to recover her payments or any overcharges on her behalf or behalf of the class, or otherwise base her claim on imposition, that claim must also be dismissed pursuant to the voluntary payment doctrine.

## II.   Count II: Violation of FDUTPA

### A.   The Plaintiff Cannot State a Claim Under FDUTPA Because the Lack of a Discount Does Not Render Mercy Hospital's Charges Deceptive Under the Statute.

Count II of the Plaintiff's Complaint is for violation of FDUTPA, Fla. Stat. § 501.201, *et seq.,* which is designed to protect consumers from suppliers who commit deceptive trade practices.   FDUTPA prohibits unfair methods of competition and deceptive acts or practices in the conduct of any trade or commerce.  *See Tuckish v. Pompano Motor Co.,* 337 F. Supp. 2d 1313 (S.D. Fla. 2004).  A violation of FDUTPA may be based on: (a) any rule promulgated pursuant to the Federal Trade Commission Act; (b) the standards of unfairness and deception as defined by the Federal Trade Commission or federal courts; (c) any law, statute, rule, regulation, or ordinance that proscribes unfair methods of competition or unfair, deceptive, or unconscionable acts or practices.   Fla. Stat. § 501.203(3); *see also Tuckish,* 337 F. Supp. 2d at 1319-20.

The Plaintiff has not alleged a violation of FDUTPA based on any of the authorities identified by the relevant Florida Statute.  Rather, her FDUTPA claim is essentially the same as her breach of contract claim – she alleges that Mercy charged her the full, undiscounted rate for medical services while patients covered by third-party payors received a discount. These allegations do not give rise to a violation of a standard or rule, as FDUTPA sets forth.  Instead, the Plaintiff's allegations set forth a practice that has actually been held by state and federal courts *not* to constitute unfair or unreasonable

KENNY NACHWALTER, P.A.

conduct. As discussed in Section I, B, above, courts have found that contractual discounts between hospitals and third-party payors, and the resulting higher rates charged to uninsured patients, are insufficient to establish that a hospital's charges are unreasonable or unfair. *See also Kolari,* 2005 WL 710452 at *11 (holding that hospitals could not be liable for deceptive acts or trade practices under Section 349 of New York General Business Law, FDUTPA's equivalent, simply because they charged uninsured patients higher rates than patients covered by third-party payors).[8] Mercy has not found any legal authority to support the argument that hospitals must provide similar discounts to insured and uninsured patients alike, or that price differences are unreasonable, and, in fact, the law is to the contrary. Because these authorities preclude the Plaintiff from succeeding on her theory that the hospital's charges are unreasonable simply because of the price differences between uninsured patients and third-party payors, the Plaintiff cannot establish that Mercy has engaged in an improper trade practice in violation of FDUTPA.[9]

---

[8] Other state courts have dismissed similar claims by uninsured patients. *See, e.g., Cox v. Athens Regional med. Ctr.*, Case No. SU-04-CV-261-S (Ga. Super. Ct. Jul. 19, 2005); *Elliot Hosp. V. Boerner*, Case No. 04-C-739 (N.H. Super Ct. Jul. 15, 2005). (Exhibit B).

[9] The Plaintiff also complains about Mercy's collection practices as part of her FDUTPA claim. To the extent that Plaintiff is basing her FDUTPA count on Mercy's collection practices, that portion of the claim must be stricken due to her failure to plead with the requisite particularity under Federal Rule of Civil Procedure 9(b). Courts have recognized that FDUTPA (or parallel claims under other state statutes) must be specifically alleged, yet the Plaintiff's Complaint lacks any specific allegations about Mercy's collection practices or how they have damaged her. *See Stires v. Carnival Corp.*, 243 F. Supp. 2d 1313, 1322 (M.D. Fla. 2002) ("Most courts construing claims alleging violations of the Federal Deceptive Trade Practices Act or its state counterparts have required the heightened pleading standard requirements of Rule 9(b).").

KENNY NACHWALTER, P.A.

**B.     The FDUTPA Claim Must Be Dismissed Because It Is Subject To a Statutory Exception.**

Count II also must be dismissed because it is subject to an express FDUTPA exception. Section 501.212 of the Florida Statutes lists the exceptions to FDUTPA. Among those is any "act or practice required or specifically permitted by federal or state law." Fla. Stat. § 501.212(1).  The Plaintiff's Complaint is based on Mercy Hospital's billing and collection practices. These alleged practices fall within the statutory exception to FDUTPA because they are required and specifically permitted by state law.

Hospital billing and collection practices are highly regulated by the State of Florida. In fact, the Florida Legislature contemplates that insurers will receive reduced rates. Section 627.6471 of the Florida Statutes, partially entitled, "Contracts for reduced rates of payment." recognizes that health care providers and insurers "directly or indirectly [contract] for alternative or reduced rates of payment." Fla. Stat. § 627.6471(1)(c). Section 395.301 of the Florida Statutes regulates billing practices and requires that the hospital provide a patient an itemized statement upon request. Fla. Stat. § 395.301(1). Florida law requires that hospitals establish a method for a patient to be able to review and respond to questions concerning their bills and requires good faith estimates of medical costs in advance of treatment upon request.  Fla. Stat. §§ 395.301(7), 395.301(9).  Florida's Patient's Bill of Rights and Responsibilities also discusses a patient's right to financial information and mandatory disclosures, including the patient's right to request an advance good faith estimate of medical costs. Fla. Stat. § 381.026(4)(c). Because all of these practices are required and specifically permitted by Florida law, yet they are at the core of the very practices that the Plaintiff challenges in her Complaint, her FDUTPA claim must be dismissed under the statutory exception.

16

KENNY NACHWALTER, P.A.

No Florida court has had the opportunity to analyze dismissals based upon a similar exception to FDUTPA, but a Michigan district court recently dismissed a nearly identical lawsuit by an uninsured patient for this same reason. In *Burton v. William Beaumont Hospital*, 373 F. Supp. 2d 707 (E.D. Mich. June 20, 2005), the court dismissed the plaintiff's claim against the hospital under Michigan's unfair trade practices act, which is substantially similar to FDUTPA, because the plaintiff's claim was exempt from regulation under the Michigan statute. Like the plaintiff here, the plaintiff in *Burton* claimed that the defendant hospital was engaged in deceptive and unfair trade practices because it charged uninsured patients more than third-party payors. *Id.* at 719.  The Michigan statute excepted transactions and conduct "specifically authorized by a regulatory board or officer acting under statutory authority of this state or the United States." *Id.* at 720.  Citing prior Michigan decisions, the court observed that, in order to determine whether an act was exempt under the statute, "the relevant inquiry is not whether the specific misconduct alleged by the plaintiffs is 'specifically authorized.'  Rather, it is whether the general transaction is specifically authorized by law, regardless of whether the specific misconduct alleged is prohibited." *Id.* (citations omitted).  In that case, the billing process was governed by a provision that states that "[a] patient or resident is entitled to receive and examine an explanation of his or her bill regardless of the source of payment and to receive upon request, information relating to financial assistance available through the facility." *Id.* (quoting M.C.L. § 333.20201(2)(l)). The court also observed that the Michigan code discussed the patient's rights and contained enforcement provisions that allowed a person to complain of a violation of the code to the Michigan Department of Community Health.  Because of these provisions, and the fact that the health care industry is highly

KENNY NACHWALTER, P.A.

regulated by the state and federal government, the court held that the conduct at issue fell within the Michigan statute's exception. *Id.*

The Plaintiff's FDUTPA claim should be dismissed on the same grounds as the dismissal in *Burton.*[10] Florida has enacted laws akin to Michigan's hospital billing statutes. As previously mentioned, Section 395.301 of the Florida Statutes regulates billing practices. Like the Michigan code, it requires that the hospital provide a patient an itemized statement "upon request." Fla. Stat. § 395.301(1). Other provisions address patients' rights and responsibilities and the procedures for a patient to inquire about billing issues. *See* Fla. Stat. §§ 381.026(4)(c), 395.301(7), 395.301(9). Another provision recognizes that reduced payment terms are common for insurers. *See* Fla. Stat. § 627.6471(1)(c). The Plaintiff has not and cannot credibly allege that Mercy Hospital violated any of these laws, which set forth the acts and practices required by Florida law as they relate to hospital billing. If the Plaintiff wishes to challenge these laws, she must do so through the legislative or administrative process. She cannot lodge her challenge to Florida's health care policies as a FDUTPA claim in the courts. As such, her FDUTPA claim must be dismissed.

## III.    Counts III and IV: Injunctive/Declaratory Relief and Damages

To the extent that Counts I and II are dismissed, Counts III and IV also should be dismissed because they do not state independent claims. Rather, Counts III and IV simply state the relief that the Plaintiff seeks for Counts I and II. Even if the remaining claims are

---

[10] Dismissal of the FDUTPA claim is also warranted for the reasons set out in Section I, B, of this Motion. The federal and state cases discussed in that section demonstrate that charging third-party payors less than uninsured patients is an "act or practice required or specifically permitted by federal or state law." *See* Fla. Stat. § 501.212(1).

KENNY NACHWALTER, P.A.

not dismissed, Counts III and IV should be stricken as repetitive of Counts I and II as seeking a remedy and not stating an independent cause of action. Counts III and IV merely incorporate by reference all allegations of the complaint, a practice that is highly disfavored by the Courts. See *Cannon v. Metro Ford, Inc.*, 242 F. Supp. 2d 1322, 1332 n.2 (S. D. Fla. 2002) (stating that court should not have to sift through entire complaint) (citations omitted).

Additionally, Count III also should be dismissed because the equitable relief it seeks is within the province of the legislature or an administrative body.[11] The Plaintiff requests that the Court order Mercy to cease charging its current rates and to change its current collection practices. As other courts have recognized, such relief is not within the province of the courts. See *Kolari*, 2005 WL 710452 at *1 ("Plaintiffs here have lost their way; they need to consult a map or a compass or a Constitution because Plaintiffs have come to the judicial branch for relief that may be granted by the legislative branch."). Count III should be dismissed in the proper exercise of judicial restraint.

## Conclusion

The Plaintiff's entire Complaint is based upon the faulty premise that she is entitled to be billed at the same rates that third-party payors have negotiated with Mercy and that the legislature has given to specific patient populations. Allowing this case to proceed would effectively allow the Plaintiff to use the Court to impose new contractual obligations between the parties or engage in judicial lawmaking, neither of which the Court should undertake in its role of deciding only justiciable disputes.

---

[11] An additional basis for dismissal of Count III is the fact that the Plaintiff has failed to set forth the required pleading elements for injunctive relief or for a declaratory judgment.

19

KENNY NACHWALTER, P.A.

Case No. 05-22409-Civ-Seitz/McAliley

WHEREFORE, Mercy Hospital respectfully requests that the Court dismiss the

Complaint filed against it.

Respectfully submitted,

ON BEHALF OF MERCY HOSPITAL, INC.

Lewis W. Fishman (Fla. Bar No. 224235)
E-mail: lwfpa@aol.com
LEWIS W. FISHMAN, P.A.
2 Datran Center
9130 Dadeland Boulevard
Suite 1121
Miami, Florida 33156-7848
Telephone:  (305) 670-2100
Facsimile:   (305) 670-0793

Thomas H. Seymour (Fla. Bar No. 100271)
E-mail: tseymour@kennynachwalter.com
Robert D. W. Landon, III (Fla. Bar No. 961272)
E-mail: rlandon@kennynachwalter.com
Christina M. Ceballos-Levy (Fla. Bar No. 411965)
E-mail: ccl@kennynachwalter.com
KENNY NACHWALTER, P.A.
201 South Biscayne Blvd., Suite 1100
Miami, Florida 33131-4327
Telephone:  (305) 373-1000
Facsimile:   (305) 372-1861

## Certificate of Service

I certify that a copy of the foregoing document was served by facsimile and U.S.
mail on September 27, 2005 on all other counsel of record on the attached Service List.

Christina M. Ceballos-Levy

232270.2

- 20 -

KENNY NACHWALTER, P.A.

## SERVICE LIST

Barbara Colomar vs. Mercy Hospital, Inc. and Catholic Health East, Inc.
Case No. 05-22409-Civ-Seitz/McAliley

Dewitt M. Lovelace, Esq.
LOVELACE LAW FIRM, P.A.
36474 Emerald Coast Parkway
Suite 4202
Destin, Florida 32541
Telephone:   850-837-6020
Facsimile:   850-837-4093

Bryan A. Vroon, Esq.
John W. Crongeyer, Esq.
VROON & CRONGEYER, LLP
1230 Peachtree Street, #2450
Atlanta, GA 30309
Telephone:   404-607-6710
Facsimile:   404-607-6711

Don Barrett, Esq.
BARRETT LAW OFFICES, P.A.
404 Court Square North
P.O. Box 987
Lexington, MS 39095
Telephone:   662-834-2376
Facsimile:   662-834-2628

Richard Heimann, Esq.
Kelly Dermody, Esq.
LIEFF, CABRASER, HEIMANN
 & BERNSTEIN, LLP
275 Battery Street, 30th Floor
San Francisco, CA 94111-3339
Telephone:   415-956-1000
Facsimile:   415-956-1008

Joseph E. Bartel, Esq.
1700 Prospect Street
Sarasota, Florida 34239
Telephone:   941-951-3979
Facsimile:   941-953-8243

*Attorneys for Plaintiff*

Laura Ganoza, Esq.
Alan R. Poppe, Esq.
BUCHANAN INGERSOLL, P.C.
Bank of America Tower, 34th Floor
100 S.E. Second Street
Miami, Florida 33131
Telephone:   305-347-4080
Facsimile:   305-347-4089

Steven E. Bizar, Esq.
BUCHANAN INGERSOLL, P.C.
1835 Market Street, 14th Floor
Philadelphia, PA 19103-2985
Telephone:   215-665-8700
Facsimile:   215-665-8760

*Attorneys for Catholic Health East, Inc.*

Thomas H. Seymour, Esq.
Robert D. W. Landon, III, Esq.
Christina M. Ceballos-Levy, Esq.
KENNY NACHWALTER, P.A.
1100 Miami Center
201 South Biscayne Boulevard
Miami, Florida 33131-4327
Telephone:   305-373-1000
Facsimile:   305-372-1861

Lewis W. Fishman
LEWIS W. FISHMAN, P.A.
2 Datran Center
9130 Dadeland Boulevard
Suite 1121
Miami, Florida 33156-7848
Telephone:   (305) 670-2100
Facsimile:   (305) 670-0793

*Attorneys for Defendant Mercy Hospital, Inc.*

KENNY NACHWALTER, P.A.

# EXHIBIT A

**CIRCUIT COURT OF SOUTH DAKOTA**
**SECOND JUDICIAL CIRCUIT**
425 N. Dakota Avenue
Sioux Falls, SD  57104-2471

**CIRCUIT JUDGES**
Glen A. Severson, Presiding Judge
Gene Paul Kean
William J. Srstka, Jr.
Kathleen Caldwell
Peter H. Lieberman
Joseph Neiles
Stuart L. Tiede
Bradley G. Zell

**COURT ADMINISTRATOR**
Karl Thoennes III

Phone (605) 367-5920
Facsimile (605) 367-5979

**STAFF ATTORNEY**
Jill Moraine

September 15, 2005

I.

Sherry B. Nygaard v. Sioux Valley Hospitals and Health Systems, CIV 05-391

Robert J. Burns, Jr.
Stanley E. Siegel
Phillip A. Pfaffly
33 S. Sixth Street, #4900
Minneapolis, MN  55402

Roberto A. Lange
P.O. Box 1030
Sioux Falls, SD  57101-1030

Daniel R. Fritz II
P.O. Box 1920
Sioux Falls, SD  57101

Donald R. Schultz
P.O. Box 8250
Rapid City, SD  57709

II.

Robert Dosch v. Avera Health CIV 05-392

Robert J. Burns, Jr.
Stanley E. Siegel
Phillip A. Pfaffly
33 S. Sixth Street, #4900
Minneapolis, MN  55402

Thomas Welk
Christopher Madsen
P.O. Box 5015
Sioux Falls, SD 57117-5015

Daniel R. Fritz II
P.O. Box 1920
Sioux Falls, SD  57101

Donald R. Schultz
P.O. Box 8250
Rapid City, SD  57709

Dear Counsel:

The plaintiffs, Sherry B. Nygaard (Nygaard) and Robert Dosch (Dosch), have commenced
separate, individual class action proceedings.  Because the basis for their respective allegations

1

have much in common, the Rule 12 (b) motions to dismiss, which has been filed in each case, will be considered together.

## Background

### Nygaard

Nygaard is a South Dakota resident. Sioux Valley Hospital and Health Systems (Sioux Valley) is a South Dakota non-profit corporation involved with the delivery of healthcare services. As a non-profit corporation, Sioux Valley receives certain public benefits and tax exemptions. It is also designated as a 501(c)(3) entity for federal tax purposes.

In May, 2003 Nygaard was a patient at Sioux Valley's facilities in Vermillion, South Dakota "at which time she had intestinal surgery or received other treatments relating to that surgery." (Complaint ¶ 22) She was uninsured. Sioux Valley billed her for the full cost of services without any discount. Although she has made payments on the account, a balance still remains.

Nygaard seeks to have the litigation certified as a class action pursuant to SDCL 15-6-23(a), -23(b)(2) and -23(b)(3) alleging that the class of people involved is significant and numerous and she is able to represent the class. The causes of action Nygaard asserts are, in summary form, as follows:

A. Breach of Contract. The basis for this claim is a belief that Sioux Valley's charges for services are neither fair nor reasonable.

B. Beach of Duty of Good Faith and Fair Dealing. This claim asserts that Sioux Valley is acting in bad faith by failing to provide affordable health care and charging the highest rate to Nygaard. Part of this claim states that Sioux Valley is not using its assets to provide affordable health care.

C. Violation of SDCL 37-24, South Dakota's Deceptive Trade Practices and Consumer Protection Act. The gist of this claim is that, while Sioux Valley advertises itself as a charitable organization, it charges uninsured care recipients as a different rate then those similarly situated who are insured or who are Medicare recipients

D. Adhesion Contract. This claim specifies that Sioux Valley was in essence charging Nygaard certain fees which were originally unspecified and which were forced upon her without negotiation. Because of the litigants' unequal bargaining position and unconscionable charges, the agreement for services is unenforceable as an adhesion contract.

E. Unjust Enrichment. This portion of the litigation is based upon the claim that Sioux Valley has failed to provide mutually affordable medical treatment to Nygaard despite receiving federal revenue and state tax exemptions thereby unjustly enriching itself. Nygaard claims that Sioux Valley should not be allowed to retain these monies and assets purchased acquired from this special status and that a constructive trust should be imposed upon the excessive fees and assets for the benefit of the class.

Nygaard seeks the following relief:

A. Injunction relief to terminate any attempt to collect the remaining balance due. As a part of this request, Nygaard appears to be seeking a reduction in the medical charges to some lower amount.

B. General economic and punitive damages.

C. Certification of the proceeding as a class action.

D. Ordering that a constructive trust be established and that this trust be funded with monies and assets from Sioux Valley.


Dosch

Dosch is also a South Dakota resident. Avera Health (Avera) is a South Dakota non-profit corporation operated by the Benedictine and Presentation Sisters. Avera provides health care services in eastern South Dakota. Avera, like Sioux Valley, has a mission statement which encompasses the concept of providing a quality, cost-efficient health care system, but adds to this general system a component based upon a Christian ministry centered upon the teachings of Jesus Christ.

Avera also is a 501(c)(3) entity for federal tax purposes and also has an exemption for South Dakota tax purposes. The Dosch complaint is in most respects, after a recitation of the facts specific to him, a document which runs parallel to the Nygaard complaint. Dosch also seeks class action status. Unlike Nygaard, Dorsh's date of service from Avera reaches back to 1993. As the litigation was not commenced until 2005, the claim facially exceeds the applicable statutes of limitations on one claim (contract issues) by five years and the other claim (Deceptive Trade Practices) by nine years. However, Dosch asserts that the statute of limitations should be equitably estopped or tolled, probably taking his cue from the decision of *Dakota Truck Underwriters v. South Dakota Subsequent Injury Fund*, 2004 SD 120, 689 NW2d 196. His causes of action are:

A. Breach of contract.

B. Adhesion contract.

C. Breach of duty of good faith and fair dealing.

D. Violation of SDCL 37-24, South Dakota's Deceptive Trade Practices and Consumer Protection Act.

E. Unjust enrichment.

Dosch seeks this relief:

A. Injunctive relief.

3

B. General economic and punitive damages.

C. Certification of the case as a class action.

D. Ordering that a constructive trust be established.

To demonstrate that the complaints run parallel in their allegations, the court notes that the language in the pleadings of these paragraphs in each respective complaint, save the gender, are identical:

| Nygaard Complaint | Dosch Complaint |
|:---:|:---:|
| 26 – 38 | 31 - 43 |
| 39 – 48 | 44 – 53 |
| 49 – 53 | 54 – 58 |
| 54 – 58 | 59 – 63 |
| 59 – 62 | 64 – 67 |
| 63 – 68 | 68 – 73 |
| 69 – 72 | 74 – 77 |
| 73 – 76 | 78 – 81 |
| 77 – 78 | 82 – 83 |
| The closing paragraph | The closing paragraph |

The Dosch case has several parts of its motion which are different, namely, the assertion of defenses based upon the statute of limitations and res judicata. This decision will begin with the claims which are common to both lawsuits. These are generally grouped under a heading called "the contract claims."

**A.**

Dosch claims that he entered Avera St. Luke's Hospital in Aberdeen and received medical treatment for a broken hip. Nygaard claims she entered the hospital at Sioux Valley's facility in Vermillion where she underwent surgery and other related treatments. Both parties acknowledge that they entered into a contract for such medical services and agreed to pay for these services. Both were uninsured. When the health facilities sent their statement for services rendered, no discounts were granted. Discounts might have been available if the parties were insured privately or if a governmental agency was involved. The litigants allege that because there was no discount, both medical providers breached its contract. The contract is silent on the topic of discounts. The theory is that, since no discounts were provided, a breach must have occurred. Perhaps another manner to describe the lawsuit is that Dosch and Nygaard asserts that they were only to be charged fair and reasonable charges which they equate to mean the discounted rates of private or governmental agreements with Sioux Valley or Avera.

As is well known among all who are legally educated, there are several basic tenets which apply to a court's review of a contract. While there is no dispute that there was a contract in each instance for medical services, what a contract means and how it is interpreted is a matter of law. However, in performing this process the court may not alter the terms of the contract by either adding or deleting language. The court is required to look at the plain language of the contract and enforce it according to the language used. Cotton v. Manning, 1999 SD 128, ¶ 15, 600 N.W.

4

2d 585, 588. These rules have been applied to numerous situations from insurance contracts, SDCP v. Wausau Underwriters, Inc., Co., 2000 SD 116, 616 N.W. 2d 397 to teacher's contracts. Gettysburg School Dist. v. Larson, 2001 SD 91, 631 N.W. 2d 196. Cases in other contexts exist and these recent cases are only illustrative of the variety of situations in which the rules have been applied.

The alleged breach in this case apparently appears because the hospitals did not charge a reduced rate. Yet, there is no language in the contract which required either hospital to do so. Dosch and Nygaard respond by referring to the non-profit mission statements of each hospital and language which appears in various forms in which the hospitals agree to provide services regardless of a patient's ability to pay including free care for patients who have no ability to pay. The litigants go on to claims that, because they have no insurance, implying they have no ability to pay in full or in part, to bill them for the full amount violates their charger which translates into a breach of contract. The difficulty with this line of reasoning is that it pulls the court from that role of deciding controversies and interpreting a contract and places the court into the role of a policy maker. Non-profit corporations are governed by SDCL 47-22. To add a condition to hospital contracts that all patients are to be treated equally would usurp the traditional role of the Legislature. There is no question that the Legislature has reserved this policy-making role. At SDCL 47-22-74 the statute recites that the "Legislature shall at all times have power to prescribe such regulations, provisions, and limitations as it may deem advisable..." To rule for the plaintiffs would require that the court re-write the contract and insert this phrase of concept into the contract.

There is no separate cause of action for breach of a duty of good faith and fair dealing. For some reason this concept has generally been misunderstood both in what it means and how it is applied. One point is clear, however. It is not an independent cause of action. In Farm Credit Services of America v. Dougan, 2005 SD 94, ___ N.W. 2d ____, borrowers on a note secured by a mortgage on ranch land were sued for foreclosure. They counterclaimed seeking damages for breach of an implied covenant of good faith and fair dealing. The issue in the case was that the borrowers wanted a longer extension of time to make a late payment and the lender would not give an extension of the length requested. The borrowers believed this was enough to allow them to sue for breach of a duty of good faith and fair dealing. The Supreme Court disagreed:

> The covenant of good faith does not create an amorphous companion contract with latent provisions to stand at odds with or in modification of the express language of the parties' agreement. It is not a repository of limitless duties and obligations.

Id. at ¶ 9

This is also the situation which is before the court. Dosch and Nygaard's position is that the hospital breach this duty of good faith and fair dealing apart from the contract to provide medical services. Such a cause of action cannot exist. It must be part of the original contract, not viewed independently and apart from it. But, as the hospital had no obligation to reduce its fees, and in fact did provide services, apparently with a good result, there is no breach of the contract.

The final point deals with the concept of an adhesion contract. The general concept of an adhesion contract is recognized in South Dakota. See for example, Rozeboom v. Northwestern Bell Telephone Co., 358 N.W. 2d 241 (SD 1984) and Citibank (S.D.), N.A. v. Hauff, 2003 SD

5

99, 668 N.W. 2d 528. However, this is merely just a portion of the discussion about the much larger topic of standardized contracts.

Standardized contracts or agreements are part of every-day life. They are encountered when a person buys home, auto or life insurance, executes a note and gives a mortgage to buy a residence, opens a brokerage account, applies for a credit card, takes a public conveyance, starts a checking account, signs up for email and internet services, and even when attending a concert, play, or sporting event. A standardized contract usually entails some unequal bargaining power as a standardized contract is a written accumulation of experience in a particular trade or business. While traditionally the terms of a contract are bargained for, the notion of standardized agreement reduces the bargaining to a minimum. In some cases, the courts have upheld the standardized form and in other cases have rejected it. Compare O'Callaghan v. Waller & Bechwith Realty Co., 155 N.E. 2d 545 (Ill. 1958) (exculpatory clause in lease upheld; the matter was appropriate for legislative, not judicial, action) with Henningson v. Bloomfield Motors, 161 A 2d 69 (N. § 1960) (disclaimer of warranty on a form designed by Automobile Manufactures Association and imposed upon purchaser could not be enforced). Yet, throughout the many cases nationwide which have discussed standardized contracts in general and adhesion contracts in particular, there is no cases which this court has found which holds that an adhesion contract is automatically void. In fact the contracts are generally valid and the enforcement is problematic only when certain conditions are found to exist. The cases in South Dakota are a good place to continue the discussion.

In Rozeboom v. Northwester Bell Telephone Co., *supra*, the plaintiff sued the phone company because it had omitted to insert his name in the business yellow pages. Plaintiff owned an electrical business and had been solicited by the phone company to buy the yellow page advertising and had paid the fee. In defense to the claim, the phone company raised a clause in the yellow page contract which attempted to limit its liability to the amount of the fee if the business' name was omitted and erroneously left out of the yellow page printing. After some general expressions about the nature of adhesion contract and references to earlier South Dakota cases which mentioned them, the state Supreme Court then referred to a North Dakota decision:

> (1) A contract is construed most strongly against the party who prepared it *** (2) An agreement which is essentially a "contract of adhesion" should be examined with special scrutiny by the courts to assure that it is not applied in an unfair or unconscionable manner against the party who did not participate in its drafting.

358 N.W. 2d at 244-45

But, the critical language of the case is this:

> We do not suggest that simply because this contract is standardized and preprinted, ipso facto, it is unenforceable as a contract of adhesion. Rather, we hold that the terms of this specific standardized contract are unreasonable, oppressive and therefore unconscionable.

358 N.W. 2d at 245

The Rozeboom decision on the general law is consistent with other decisions which require more than merely showing that a standardized contract drafted by one party was the basis of the

6

agreement. Moreover, merely showing there was little or no negotiation between the parties is not enough. Nor is it adequate to only show the agreement is truly a contract of adhesion. It must be shown that it is an unconscionable agreement, i.e., "One sided agreements whereby one party is left without a remedy for another party's breach." 358 N.W. 2d at 244. Baldwin v. National College, 537 N.W. 2d 14, 17 (SD 1995). Accord: American Bankers Mortgage Corp. v. Federal Home Loan Corp., 75 F. 3d 1401 (9th Cir. 1996) (fact that contract was adhesive did not make termination provisions unenforceable); Harper Tax Services v. Quick Tax Ltd., 686 F. Supp. 109 (D. Md 1988) ("… [T]hat the agreement was an adhesive contract… does not lead to the conclusion it was unconscionable."); Graham v. State Farm Mutual Auto Inc. C., 559 A 2d 908 (C-4. 1989) ("… [F]act that a contract is adhesive does not give rise to a presumption of unenforceability."); Abbott v. Amoco Oil Co., 619 N.E. 2d 789 (Ill. App. 1993)("Something beyond adhesion is required to subject or contract to judicial scrutiny."); Hartford Computer v. Insurance Man, 770 SW 2d 525 (Mo. App. 1989)("…[R]ule automatically invalidating adhesion contracts would be completely unworkable.").

Furthermore, courts have been reluctant to pass judgment on the fairness of prices when considering the issue of unconscionability. While cases exist which have held excessive prices on products sold may be unconscionable, professional fees appear to hold a different status. Shaffer v. Superior Court, 39 Cal. Rptr. 2d 506 (Ct. App. 1995)

For either Dosch or Nygaard to succeed under any theory regarding an adhesion contract, they must demonstrate that the agreement to provide medical services was not only an adhesion contract, but that it should not be enforced because it is unconscionable. Whether it is unconscionable is a matter of law. The question becomes, assuming that the agreement is an adhesion contract, is whether charging indigent patients more than others, who have private or governmental insurance and who bargain for lesser rates, places them in an unconscionable position? This court has previously ruled that the policy of these nonprofit institutions to charge different rates to different classes of patients is an issue for the legislative branch of government to resolve. It is that branch of state government which should resolve this policy question.

The plaintiffs argue that for them to pay more than others violates their reasonable expectations from the contract for medical services because they believe they would only be charge fair and reasonable medical prices. This argument is again based upon the premise that everyone would be charged a single universal fee regardless of one's relationship with the defendants. What is overlooked here is that the plaintiffs admit in their complaints that the reason the other groups pay lower fees is because of federal or state laws or because an independent third party, usually a private insurance carrier, has negotiated for reduces fees. These other groups benefit either from laws designed for them, such as Medicaid, or are part of a group which has paid premiums and their insured then seeks reduces fees for their group. If either plaintiff qualified by law or by being a group member, each would benefit respectively. But, the plaintiffs desire to benefit when they do not qualify. How they can have a reasonable expectation of benefiting under programs or through insurance groups they do not qualify for? Plaintiffs also ignore the fact that full rates are charged the uninsured even one who has the means to pay.

What is a constructive trust? What is its relationship to the doctrine of unjust enrichment? What causes it to come into existence? One early expression which answers these three questions is as follows:

> A constructive trust is a relationship with respect to property subjecting the person by whom the title to the property is held to an equitable duty to convey it to another on the ground that his acquisition or retention of the property is wrongful and that he would be unjustly enriched if he were permitted to retain the property.

Restatement (Trusts) sec. le.

Accord: In re National Benefit Association, 72 SD 23,, 36, 29 N.W. 2d 81, 88 (1947); Olsen v. First National Bank, 76 SD 605, 610 – 11, 83 N.W. 2d 842, 845 (1957). The concept is codified at SDCL 55-1-6 to -11.

The complaints alleges that "Defendant has been unjustly enriched at the Plaintiff's (sic) and Class' expense." The basis of this assertion is: "Defendant has failed to provide mutually affordable medical care to Plaintiff and the class despite receiving millions of dollars in federal and state tax exemptions for such purpose... Defendant failed to utilize its substantial net assets and revenues to provide mutually affordable medical care... Defendant has also realized profits in the millions of dollars by charging Plaintiff and the class unreasonably high rates (as compared to) insured patients... As a result of Defendant's actions, along with its wrongful, unfair, discriminatory, abusive, and non-charitable conduct. Defendant is in the possession of tax savings, profits, and other assets that it in good conscience and equity should not be entitled to retain."

This court will not visit the federal tax issue as that matter has been decided upon numerous occasions in federal courts throughout the United States. When a federal court decides a federal law issue, the decision is binding upon the state courts. In regard the remaining language upon which is based the theory of unjust enrichment, Dosch and Nygaard again resort to a belief that because they were charged more then insured groups or groups with defined benefits under law, there is some mischief which is loose upon the public. In the context of an actual contract, this court earlier concluded that, if these charitable institutions are to be compelled to charge single fees regardless of one's status, then this is for the legislative to determine. There is no reason to adopt a different and inconsistent position in the context of unjust enrichment/constructive trusts. Nor is there good reason to spend much time dissecting the legal notion of whether an unjust enrichment claims can be brought when a litigant has pled that an actual contract exists. In McFarland v. McFarland, 470 N.W. 2d 849, 851 (SD 1991), the Supreme Court wrote that "Before a court can impose a constructive trust, there must be a showing of fraud or unconscionable conduct." Plaintiffs have not pled fraud unless the word "wrongful" was meant to cover the point. Moreover, the court has already discussed the matter of "unconscionability" and concluded as a matter of law that there was no such showing as a basis for a contract of adhesion. The same legal conclusion is compelled when considering unjust enrichment and constructive trusts.

Avera has pled the statute of limitations as a defense. SDCL 15-2-13(1) applies to both the contract claim (and all its subparts) as well as to the unjust enrichment claim which is in effect an implied contract. This code provision requires that Dosch's claim be brought "within six years after the cause of action shall have accrued." Dosch's medical services were concluded in mid – 1993, Avera was not served with a summons until February 17, 2005, nearly twelve years later. The statute of limitations for the violation of SDCL 37-24, the Deceptive Trade Practices Law, is two years "after the occurrence or discovery of the conduct which is the subject of this action."

8

SDCL 37-24-33. Again, the summons was not served until February 17, 2005 and the claim of deceptive conduct occurred in May, 1993.

Dosch never sets forth any facts but in a general allegation states that the applicable statute of limitations was tolled by Avera's deceptive practices, that Avera concealed the truth about its prices and billing practices, and that he could not have reasonably discovered Avera's "wrongful and discriminatory pricing practices." Complaint ¶¶ 44 – 48. The balance of this portion of his complaint goes on to decry the fact of the actual billing by Avera without first determining whether or not he could actually pay for the services.

There is actually no need to delve too deeply into the issue of whether an equitable tolling of the statute of limitations has been properly pled under either theory of recovery. In passing this court will note that the decision of Dakota Truck Underwriters v. SD Subsequent Injury Fund, 2004 SD 120, 689 N.W. 2d 196 is unusual on its facts and it is a decision which probably has no legal equivalent in this state. Yet, there is still no need to analyze the decision to ascertain how it is distinguishable from the present situation. This is not to write that *Dakota Truck Underwriters* is not an important decision. It is simply that it does not apply to Dosch's case.

As written above, the central theme of Dosch's claims is that he did not discover until recently that Avera had concealed its "wrongful and discriminatory pricing practices" from him. However, it has already been ruled that Avera had no special obligation to bill Dosch for lower rates. Thus, when he first learned of these pricing practices is immaterial. There was nor could there be any improper or fraudulent concealment of any information. Again, Dosch begins from the viewpoint that he should have been charged a lower rate, a viewpoint which this court disagrees with. Consistent with earlier portions of this decision, this court concludes that, as there was nothing inappropriate with Avera billing practices, Dosch cannot assert a equitable tolling of either statute of limitations. Avera should prevail upon this point.

Both plaintiffs allege a violation of SDCL 37-24 et seq, South Dakota's Deceptive Trade Practices Act. There is a problem in determining exactly which provision of Ch. 37-24 either defendant has violated. While a "service" is within the definition of "merchandise," SDCL 37-2-1(7), it is difficult to determine what provision was breached. A reference to each complaint sheds no further light onto which portion of SDCL 37-24-6 was violated. To bring a claim under Ch. 37-24, the plaintiffs are bound to deceptive practices list in Section 6. This is clearly spelled out in SDCL 37-24-7.

Rather then setting forth a specific section of SDCL 37-24-6, ignoring of course those sections dealing with campsites, paid advertising, cessation of a business operation and most of the other thirteen provisions, Dosch and Nygaard revert to their general theme of overcharging by these charitable hospitals which is equated to a deceptive practice. Assuming without actually knowing that these alleged deceptive trade practices were meant to refer to SDCL 37-24-6 (1), Dosch and Nygaard's claim do not fit this code provision. The fundamental argument remains the same: uninsured people should not be charged any more for medical services than the charges paid by people who by law are to receive a lesser rate or negotiate a lesser rate. But again, the consistent holding of this court has been that the defendants were under no obligation to charge discounted rates or fees. SDCL 37-24-10 provides further that the Deceptive Trade Act does not apply "to acts or practices permitted under laws of this state or the United States." Thus, the constant mantra that the defendants' 501 (c)(3) status or its tax exempt status in South Dakota in some fashion requires that reduced rates be charged is not well taken. The federal

decisions cited by the defendants have resolved the 501 (c) (3) situation in favor of similarly situated hospitals and health care providers and should apply to this case too. Further, there are no provisions in the Charitable Organization laws or state regulations by which these defendants are obligated to charge reduced rates.

There are various claims for actual damages, punitive damages and injunctive relief. These points need not be addressed as relief can only be granted or considered if a party prevails upon the underlying causes of action.

The defendants have requested a dismissal of these lawsuits pursuant to SDCL 15-6-12 (b) (5). A motion of this nature requires the trial court to test the legal viability or sufficiency of the pleadings. No factual determination can be made as the court is to accept all material allegations of the complaint as true. The motion must be resisted, however, and "While the burden is light to overcome motions to dismiss for failure to state or claim, plaintiffs must show entitlement to relief through some viable legal theory." Fenske Media Corp. v. Banta Corp., 2004 SD 23, ¶¶ 7, 17, 676 N.W. 2d 390, 392-93, 395. The plaintiffs have failed their burden and the motion to dismiss in each case is granted.

Defendants shall prepare and present the appropriate orders consistent with this decision before October 1, 2005.

Yours truly,

Gene Paul Kean

GPK/jmw


P.S. On an related point, Avera mentions in its brief that Dosch went bankrupt and this discharged his debt due Avera. However, Avera did not submit the schedules showing that Avera was an unsecured creditor. There was an offer made by the court to allow Avera the opportunity to do this, but Avera declined seeking a dismissed by Rule 12 (b) alone. There may have been some concern that the use of records outside of the pleadings may have transformed the Rule 12 (b) motion to a summary judgment motion. SDCL 15-6-12 (b); Herr v. Dakotah, Inc., 2000 SD 96, 613 N.W. 2d 549. However, there is an exception to this rule. When the matters outside of the record are matters of public record of which the court may take judicial notice, the use of these records does not require transforming the Rule 12 (b) motion to one for summary judgment. Jenner v.Dooley, 1999 SD 20, 590 N.W. 2d 463. Of course, the consequences of the bankruptcy are significant for any unlisted claim. See Foster v. Foster, 2003 SD 151, 673 N.W. 2d 667; Oneida Motor Freight, Inc., v. United Jersey Bank, 848 F. 2d 414 (3rd Cir. 1988)

COPY

IN THE SUPERIOR COURT OF ATHENS-CLARKE COUNTY
STATE OF GEORGIA

FILED IN
CLERK'S OFFICE
SUPERIOR/STATE COURT

05 JUL 21 AM 9: 31

BEVERLY LOGAN. CLERK
CLARKE COUNTY. GEORGIA

——————DOCKET INITIALS

|  |  |  |
|---|---|---|
| MERCER L. COX, *et. al.*<br>Plaintiff, | * | CIVIL ACTION NO: |
|  | * |  |
| vs. | * | SU-04-CV-2161-S |
|  | * |  |
| ATHENS REGIONAL MEDICAL<br>CENTER, INC.,<br>Defendant. | * |  |

---

### ORDER

The above-styled case has come before the Court on Defendant's Motion to Dismiss. Having considered all pleadings submitted by the parties, as well as oral argument by counsel, it is hereby **ORDERED** that the Defendant's Motion to Dismiss be **GRANTED**.

### BACKGROUND

The Plaintiffs filed a class action suit against Athens Regional Medical Center, Inc. ("Athens Regional") seeking monetary damages, injunctive and other equitable relief. (Am. Compl., p.1) Athens Regional is an Athens-based healthcare provider. It is classified as a charitable, tax-exempt nonprofit hospital system (Am. Compl., ¶ 4). Plaintiffs received treatment from Athens Regional.

Plaintiffs allege that Athens Regional charges uninsured patients grossly inflated rates for medical care as compared to the rates assessed for insured patients and patients with Medicaid and Medicare (Am. Compl., ¶ 1). Plaintiffs further allege that Athens Regional engages in these discriminatory practices despite the fact that it is a non-profit organization (Am. Compl., ¶ 4). Additionally, Plaintiffs contend that Athens Regional utilizes abusive collection practices in seeking to obtain payments for medical services (Am. Compl., ¶ 3). Finally, Plaintiffs argue that Athens Regional breached the contracts entered into with Plaintiffs that were signed at the time Plaintiffs were admitted to the

1

hospital by failing to charge a fair rate for medical services, and Athens Regional breached its statutory and common law duties.

Patients at Athens Regional must sign the Athens Regional Admission Consent Form prior to receiving treatment. The Consent Form reads in part:

> In consideration of hospital services rendered to the patient, I jointly or severally, do hereby agree to pay Athens Regional Medical Center any and every account presented to me, or us jointly and severally, for said service or services in accordance with the rates and terms of the hospital (Am. Compl., ¶ 71).

Athens Regional charges insurance companies and other third-party payors a discounted rate for services, and charges uninsured patients a "standard," or non-discounted rate. The Consent Form does not inform patients of this disparity prior to treatment (Am. Compl., ¶ 71).

The specific causes of action brought by Plaintiffs include breach of contract, implied right of action, violation of the Georgia Uniform Deceptive Trade Practices Act (UDTPA), unjust enrichment or constructive trust, request for injunctive or declaratory relief, fraudulent concealment/misrepresentation, constructive fraud, negligent misrepresentation, breach of fiduciary duties, and negligence and negligence per se.

Plaintiff Mercer L. Cox sought treatment from Athens Regional in July of 2004 for a burn on his hand. Mr. Cox was charged $941.60 for his treatment. He has made several payments to Athens Regional (Am. Compl., ¶¶ 36, 38, 40). Plaintiff Kimberly Hogland also sought treatment from Athens Regional. In September of 2003, Athens Regional obtained a judgment against Ms. Hogland for $3,421.00 (Am. Compl., ¶ 43). Plaintiff Keith Hambrick received a physical examination and outpatient surgery. He applied for financial assistance from Athens Regional but was denied. His bills totaled approximately $8,500.00. He has made payments on these bills (Am. Compl., ¶¶ 44, 45). Plaintiff Mary Sue Cox received treatment in the emergency room related to her diabetes. She was billed $2,386.00 (Am. Compl., ¶¶ 47, 48). Plaintiff John Wilson was treated at Athens Regional. He underwent a cardiac catheterization procedure. His bills totaled over $14,000 (Am. Compl., ¶ 49). All five Plaintiffs were uninsured at the time that they received treatment from Athens Regional, and all five Plaintiffs signed the Athens Regional Admissions Consent Form.

Plaintiffs initially filed their Complaint on November 11, 2004. Athens Regional filed an Answer, Counterclaim, and Motion to Dismiss on December 27, 2004. On March 8, 2005, Plaintiffs filed an Amended Complaint, following which Athens Regional filed an Answer and Counterclaim on March 15, 2005. Oral argument was heard on the Motion to Dismiss on March 25, 2005.

## ANALYSIS

### A. Breach of Contract

Plaintiffs signed a contract which reads in pertinent part:

> In consideration of hospital services rendered to the patient, I jointly or severally, do hereby agree to pay Athens Regional Medical Center any and every account presented to me, or us jointly or severally, for said service or services in accordance with the rates and terms of the Hospital (Am. Compl., ¶ 71).

Since the contract fails to specify a price, Plaintiffs allege that there was an implied duty under the contract for Athens Regional to charge "no more than a fair and reasonable charge" (Am. Compl., ¶ 73), and that Athens Regional breached the contract when it charged rates that were "unfair, unreasonable, and discriminatory" that "bear no relation to the actual cost of providing such services" (Am. Compl., ¶ 74).

A contract is breached by "a party to [the contract] who is bound by its provisions to perform some act towards its consummation and who, without legal excuse on his part, and through no fault of the opposite party, declines to do so." Douglas v. McNabb Realty Co., 78 Ga. App. 845 (1949). It is clear that Athens Regional had an express duty to render hospital services to the Plaintiffs, and it fully complied with that duty. Plaintiffs had a duty to pay for the services rendered. It is also clear from the terms of the contract that Athens Regional was to determine the rates to be charged for the services.

Plaintiffs' breach of contract claim is based on the assertion that the express terms of the contract are to be modified by implied terms of reasonableness and of good faith and fair dealing. Plaintiffs allege that Athens Regional did not fill its obligation to charge rates in compliance with these implied terms, and that therefore Athens Regional breached its contract.

3

There is a duty of reasonableness for open price terms under Georgia's Commercial Code. "A price to be fixed by the seller or by the buyer means a price for him to fix in good faith." O.C.G.A. § 11-2-305(2). However, Commercial Code provisions apply to sale of goods and not to service contracts. There is no authority in Georgia that imputes the implied duty of reasonableness to the express terms of service contracts. Therefore, it is not the duty of the Courts to determine whether the rates charged were reasonable. Furthermore, this contract does not contain an open term with regard to pricing, as hospitals are required by law to furnish patients, upon request, with a written summary of charges for services rendered. O.C.G.A. § 31-7-11(a).

Plaintiffs also allege that Athens Regional breached its duty of good faith and fair dealing in charging the Plaintiffs inflated and discriminatory rates; in charging Plaintiffs higher rates than those charged to its insured patients or Medicare patients; and in using abusive collection practices to collect the charges from Plaintiffs (Am. Compl., ¶ 76).

There is a duty of good faith and fair dealing under Georgia's Commercial Code. "Every contract or duty within this title imposes an obligation of good faith in its performance or enforcement." O.C.G.A. § 11-1-203. Courts have held that "every contract . . . includes the implied duty of good faith." Fowler v. Smith, 230 Ga. App. 817 (1998). Unlike the implied duty of reasonableness, this duty applies to service contracts and sale of goods contracts. Camp v. Peetluk, 262 Ga. App. 345, 350 (2003).

Athens Regional did not breach its duty of good faith. ". . . .It is possible to so draw a contract as to leave decisions absolutely to the uncontrolled discretion of one of the parties and in such a case the issue of good faith is irrelevant." MacDougald Const. Co. v. State Hwy. Dept., 125 Ga. App. 591, 594 (1972). "There can be no breach of an implied covenant of good faith where a party to a contract has done what the provisions of the contract expressly give him the right to do." Automatic Sprinkler Corp. v. Anderson, 243 Ga. 867, 868 (1979). The terms of the contract demonstrate that only Athens Regional was to determine the rates to be charged. It did what it was expressly permitted to under the contract. Therefore, it is impossible for Athens Regional to have breached its implied duty of good faith.

Since Athens Regional performed its duties according to the express terms of the contract, and because it did not breach any implied term of the contract, there is no valid breach of contract action.

## B. Implied Right of Action

Plaintiffs assert that they have implied rights of action against Athens Regional under O.C.G.A. § 48-5-40(5) and O.C.G.A. § 31-7-77 because Athens Regional used discriminatory pricing practices. This assertion is without merit because neither Code section creates a duty for Athens Regional.

First, Plaintiffs claim that O.C.G.A. § 48-5-40(5) requires Athens Regional to devote its income from paying patients to charitable purposes. This section of the revenue and taxation title of the Georgia code provides a definition of "Institutions of purely public charity," "nonprofit hospitals," and "hospitals not operated for the purpose of private or corporate profit and income." The terms are defined as:

> such institutions or hospitals which may have incidental income from paying patients when the income, if any, is devoted exclusively to the charitable purpose of caring for patients who are unable to pay and to maintaining, operating, and improving the facilities of such institutions and hospitals, and when the income is not directly or indirectly for distribution to shareholders in corporations owning such property or to other owners of such property. O.C.G.A. § 48-5-40(5).

Since this is merely a definition, it does not give rise to any duty. In addition, the definition does not require income to be used for the sole "charitable purpose of caring for patients who are unable to pay," as Plaintiffs assert, but instead includes other uses for income such as "maintaining, operating, and improving the facilities of such institutions and hospitals." O.C.G.A. § 48-5-40(5).

Second, Plaintiffs claim that Athens Regional has a duty to "fix rates and charges" consistent with the Hospital Authorities Act and O.C.G.A. § 31-7-77 according to the "Lease and Transfer Agreement" between Athens Regional and the Hospital Authority of Clarke County. This argument fails because O.C.G.A. § 31-7-77 does not give any duty to the hospital. The code section states, "No authority shall operate or construct any project for profit." Clearly, the Code section refers only to the rights and duties of the Hospital Authority. Furthermore, Plaintiffs are neither parties nor third party

5

beneficiaries of the obligations created within the agreement. Culbertson v. Fulton-Dekalb Hosp. Auth., 201 Ga. App. 347, 349 (1991) (*rev'd on other grounds*, Lemonds v. Walton County Hosp. Auth., 212 Ga. App. 369 (1994)).

Since neither Code section cited creates a duty for Athens Regional, Plaintiffs have no implied right of action against Athens Regional.

## C. Georgia Uniform Deceptive Trade Practices Act

Plaintiffs allege that Athens Regional engaged in deceptive trade practices by charging "inflated" rates (Am. Compl., ¶ 89). Specifically, they allege that Athens Regional violated O.C.G.A. § 10-1-372(11) and (12), which provide:

> A person engages in a deceptive trade practice when, in the course of his business, vocation, or occupation, he:
> (11) makes false or misleading statements of fact concerning the reasons for, existence of, or amounts of price reductions
> (12) engages in any other conduct which similarly creates a likelihood of confusion or of misunderstanding.

The Uniform Deceptive Trade Practices Act is not applicable to this type of lawsuit. The Act was enacted to provide a remedy "to persons likely to suffer pecuniary harm for conduct involving either misleading identification of business or goods or false or deceptive advertising" (Uniform Deceptive Trade Practices Act, prefatory note (1964)). There is no conduct alleged on the record regarding misleading identification or deceptive advertising.

More specifically, Athens Regional did not violate O.C.G.A. § 10-1-372(11). This Code section was enacted to "prevent sellers from 'luring customers with dubious representations that prices have been 'slashed' by large percentages, sometimes said to be forced by 'going out of business,' 'removal,' or 'fire sales.'" . . . The goal of the statute is the protection of consumers from overreaching and fraud on the part of the sellers." HLD Enterprises Inc. v. Michelin North America, Inc., 2004 WL 2095739 (2004). There is no indication in the record that Athens Regional made any statement concerning price reductions to Plaintiffs, let alone the type of price-slashing statement that would be sufficient to demonstrate deceptive trade practice under this statute.

Finally, Athens Regional did not violate O.C.G.A. § 10-1-372(12). The statute has not been interpreted by the Georgia Courts. However, similar statutes have been interpreted in other jurisdictions. The Court of Appeals in Minnesota interpreted the statute as requiring Plaintiffs to show that the Defendant's actions must "create a likelihood of confusion or misunderstanding as to the source, affiliation, origin, or characteristics of the goods or services . . . offered." Ford Motor Credit Co. v. Majors, 2005 WL 1021551 (2005). Plaintiffs' allegations are regarding the rates charged, and not the services offered. Therefore, this claim fails as well.

## D. Unjust Enrichment/Constructive Trust

Plaintiffs' claim of unjust enrichment must fail because of the existence of a contract between the individual plaintiffs and Athens Regional (Am. Compl., ¶ 70). Georgia law is clear that the existence of a contract bars any claim of unjust enrichment. Pryor v. CCEC, Inc., 257 Ga. App. 450, 452 (2002). Consequently, Plaintiffs are not entitled to the remedy of constructive trust based on a claim of unjust enrichment.

## E. Fraud/Constructive Fraud

Plaintiffs allege that Athens Regional has defrauded them by hiding the actual prices that Plaintiffs would be required to pay for medical services (Am. Compl., ¶ 107), and through their billing practices (Am. Compl., ¶112). In an allegation of fraud, a plaintiff must show some evidence in support of all five elements thereof in order to survive a motion for failure to state a claim on which relief may be granted. Lanier Home Ctr., Inc v. Underwood, 252 Ga. App. 745, 748 (2001). Specifically, a plaintiff must show: (1) a false representation made by the defendant, (2) knowledge of the false representation (scienter), (3) an intention to induce plaintiff to act or refrain from acting in reliance by plaintiff, (4) justifiable reliance by the plaintiff, and (5) damage to the plaintiff. Keller v. Henderson, 248 Ga. App. 526, 527 (2001).

Plaintiff has not alleged that Athens Regional intended to induce the Plaintiffs to receive treatment at their facility through the alleged misrepresentations or concealment. At best, Plaintiffs allege that Athens Regional intended to obtain more governmental and insurance industry subsidies and more direct profits from uninsured patients (Am.

7

Compl., ¶ 112). This is not sufficient to allege that Athens Regional's hidden pricing plan was intended to induce the Plaintiffs to act, but rather alleges that the pricing plan was intended to induce the government and insurance industry to act.

Additionally, Plaintiffs' Amended Complaint contains no allegation of a specific misrepresentation. Plaintiffs state, "Athens Regional also has falsely represented to Plaintiffs and the Class that, even if not given charity care, they would only be charged "fair," "reasonable," "just," and/or "customary" rates for any services and supplies they received. In fact, Plaintiffs and the Class were charged anything but "customary" or "reasonable" rates" (Am. Compl., ¶ 110). Plaintiffs have failed to allege, however, that Athens Regional has charged Plaintiffs anything other than the standard rates for the services they received. As such, the rates were "customary," and this Court finds no claim for Fraudulent Misrepresentation.

For the above-stated reasons, Plaintiffs have failed to adequately plead the required elements of Fraudulent Misrepresentation or Concealment and therefore, this allegation is without merit.

Plaintiffs' constructive fraud claim likewise fails. According to O.C.G.A. § 23-2-51(b), "Constructive fraud consists of any act of omission or commission, contrary to legal or equitable duty, trust, or confidence justly reposed, which is contrary to good conscience and operates to the injury of another." Additionally, constructive fraud is an equitable claim, and does not provide for a claim for damages. Blakey v. Victory Equip. Sales, Inc., 259 Ga. App. 34, 38 (2002). Constructive fraud is legal fraud without knowledge or scienter. Seckinger-Lee Co. v. Allstate Ins. Co., 32 F.Supp.2d 1348 (1998). Since Plaintiffs have failed to adequately allege a specific misrepresentation made by Athens Regional, the constructive fraud claim fails as well.

## F. Negligent Misrepresentation

The essential elements of negligent misrepresentation are "(1) the defendant's negligent supply of false information to foreseeable persons, known or unknown; (2) such persons' reasonable reliance upon that false information; and (3) economic injury proximately resulting from such reliance." Marquis Towers, Inc v. Highland Group, 265 Ga. App. 343, 346 (2004)(citing Hardaway Co. v. Parsons, Brinckerhoff, Quade &

8

Douglas, Inc., 267 Ga. 424, 426(1) (1997)). Plaintiffs have not alleged with particularity any specific fraudulent representations made by Athens Regional. Further, Plaintiffs have failed to demonstrate any reasonable reliance on the alleged misrepresentations. Plaintiffs have not alleged that they were charged anything more than the standard rates for the services rendered. As such, this claim must also fail.

## G. Breach of Fiduciary Duties

Plaintiffs allege that Athens Regional, as a nonprofit charity hospital, breached a fiduciary duty owed to Plaintiffs as indigent patients by charging inflated and discriminatory rates (Am. Compl., ¶ 137). This Court is aware of no duty under Georgia law in which a hospital becomes a fiduciary. Plaintiffs do not base their arguments in Georgia law, but on persuasive authority. Even though a duty such as the one Plaintiffs describe has been established in New Jersey, this is not sufficient to establish such a duty in the state of Georgia. Under Georgia law, a hospital owes a duty of reasonable care to its patients, but not a fiduciary duty.

For the above-stated reasons, Plaintiffs have failed to adequately plead Breach of a Fiduciary Duty, and as such, this allegation is without merit.

## H. Negligence

Plaintiffs allege that Athens Regional has acted negligently by utilizing discriminatory pricing tactics (Am. Compl., ¶ 142). In any claim of negligence, a Plaintiff must allege evidence of the four common elements: a duty that was breached by the Defendant, which caused damages to the Plaintiff. John Crane, Inc. v. Jones, 278 Ga. 747, 751 (2004).

This Court finds no common law duty imposed on hospitals, regardless of non-profit status, that requires hospitals to have an equivalent pricing plan for insured and uninsured patients. Although there may be damages in this case, without a duty, there can be no breach of that duty, nor causation based on the breach. As such, the other elements of negligence notwithstanding, Plaintiffs have failed to show a valid duty under Georgia law, and have not adequately plead Negligence. Therefore, this allegation is without merit.

## I.  Negligence Per Se

Plaintiffs allege that Athens Regional is in violation of O.C.G.A. § 31-7-77, and as such has violated a statutory duty.  Specifically, Plaintiffs allege that "no hospital 'shall operate or construct any project for profit,'" and that the "hospital 'shall fix rates and charges consistent with this declaration of policy . . .'" (Pl.'s Mem. in Opp'n to Mot. to Dismiss the Compl., p. 27)(*citing* O.C.G.A. § 31-7-77).

O.C.G.A. § 31-7-77 applies specifically to hospital authorities, not hospitals. O.C.G.A. § 31-7-77 (2004).  Futhermore, an "Authority", or "Hospital Authority" as defined in the chapter means any public corporation created by this article.  O.C.G.A. § 31-7-71(2) (2004).

Athens Regional is a hospital supervised by the Clarke County Hospital Authority.  This statute which Plaintiffs attempt to travel under is aimed at the state-created Hospital Authority, not individual hospitals.  As such, this statute is not applicable, and Defendant has not violated a statutory duty.

For the above-stated reasons, Plaintiffs have failed to adequately plead Negligence Per Se, as such, this allegation is without merit.

## J.  Injunctive/Declaratory Relief

Finally, Plaintiffs assert a claim for declaratory and injunctive relief ordering Athens Regional to stop "charging the Plaintiffs and the Class inflated and discriminatory rates for medical care; charging the Plaintiffs and the Class a higher amount for medical services than its insured patients for the same services; and utilizing aggressive, abusive, and harassing collection practices such as collection lawsuits, liens, and garnishments to collect grossly inflated medical debt from the Plaintiffs and the Class" (Am. Compl., ¶ 105).  Since each of Plaintiffs' claims are hereby dismissed, they are not entitled to relief in the form of an injunction or declaration.

## CONCLUSION

For the foregoing reasons, Plaintiffs' Complaint fails to state a claim upon which relief may be granted.  Therefore, Defendant's Motion to Dismiss is hereby **GRANTED** and Plaintiffs' Complaint is dismissed with prejudice.

SO ORDERED this **20ᵀᴴ** day of July, 2005.

LAWTON E. STEPHENS, Chief Judge
Superior Court
Western Judicial Circuit

Mr. Dennis Cathey, counsel for Plaintiffs
Mr. John W. Crongeyer, counsel for Plaintiffs
Mr. Bryan A. Vroon, counsel for Plaintiffs
Mr. J. Edward Allen, counsel for Defendant
Mr. Emmet J. Bondurant, counsel for Defendant
Mr. Von A. DuBose, counsel for Defendant
Mr. Michael B. Terry, counsel for Defendant

11

# THE STATE OF NEW HAMPSHIRE

HILLSBOROUGH, SS.                                    SUPERIOR COURT
NORTHERN DISTRICT

Elliot Hospital

v.

Peter T. Boerner

No. 04-C-739

## ORDER

The plaintiff, Elliot Hospital, initiated the instant debt collection action to recover $10,741.49 from the defendant, Peter Boerner, for health care services rendered to the defendant between May 15, 2003 and July 28, 2003. The defendant filed multiple counterclaims, alleging the plaintiff's "usual and customary charges" are unreasonable, discriminatory, and inflated in excess of: the amounts charged to insured patients; and the accepted industry standard Usual, Customary and Reasonable Rates. The plaintiff objects and filed a motion to dismiss the defendant's counterclaims, asserting they fail to state a valid cause of action. The court conducted a hearing on March 2, 2005. After considering the parties' arguments, pleadings, and relevant law, the court finds and rules as follows.

Standard of Review

The standard of review, when considering a motion to dismiss is whether the non-moving party's allegations are reasonably susceptible of a construction that would permit recovery. Harrington v. Brooks Drugs, Inc., 148 N.H. 101, 104 (2002); see Hobin v. Coldwell Banker Residential Affiliates, 144 N.H. 626, 628 (2000). The court "assume[s] the truth of all facts

alleged by the [non-moving party] and construe[s] all reasonable inferences in the light most favorable to [the non-moving party]." Graves v. Estabrook, 149 N.H. 202, 203 (2003). "The court must rigorously scrutinize the complaint[1] to determine whether, *on its face*, it asserts a cause of action." Williams v. O'Brien, 140 N.H. 595, 597 (1995) (internal quotations omitted) (emphasis in the original). "What is involved is a pre-trial, threshold inquiry that tests the facts in the complaint against the applicable law." Id. "If the facts do not constitute a basis for legal relief, [the court will grant] the motion to dismiss." Graves, 149 N.H. at 203.

Factual Background

  For the purposes of this motion, the court finds the following facts and procedural history relevant. Elliot Hospital is a not-for-profit, 501(c) charitable, tax exempt corporation located in Manchester, New Hampshire. From May 15-17, 2003, Mr. Boerner received both emergency room and inpatient treatment at Elliot Hospital for injuries he sustained in an automobile accident. Mr. Boerner also received follow-up outpatient treatment at Elliot Hospital on May 28, 2003 and July 28, 2003. Mr. Boerner was not covered by health insurance when he received this treatment, which resulted in three invoices for medical services totaling $10,741.49.[2]

  On all three occasions, prior to receiving treatment at Elliot Hospital, Mr. Boerner signed a document entitled "General Consent for Hospital Treatment and Limited Authorization to Disclose Information" ("the agreement"), thereby agreeing to: (1) assign any applicable insurance benefits to Elliot Hospital; and (2) pay any outstanding balance based on the hospital's usual and customary charges. See Def.'s Mot. for Class Certifications [13], Ex. B; Pl.'s Obj. to Def. Mot. to Amend Counterclaim and, In the Alternative Mot. to Dismiss Counterclaim [30], Ex. B.

---

[1] In this case, given the plaintiff is moving to dismiss the defendant's counterclaims, the court must "rigorously scrutinize" the defendant's counterclaims.
[2] The plaintiff identified the three related accounts as Account Numbers: 6915302-1; 6924735-1; and 6973020-8. See Writ of Summons [1].

Because Mr. Boerner was uninsured when he received treatment, he was charged for medical services based on Elliot hospital's usual and customary charges. Despite receiving bills and invoices from Elliot Hospital, Mr. Boerner failed to pay the outstanding balance. During the hearing, Mr. Boerner also conceded that he received a monetary settlement, in an amount that exceeds the outstanding bill from Elliot Hospital, from a third party personal injury claim arising out of the motor vehicle accident.[3] By writ of summons dated August 12, 2004, Elliot Hospital initiated the instant debt collection action.

On October 14, 2004, Mr. Boerner filed the following three counterclaims alleging: (1) Violations of the State and Federal Fair Debt Collection Practices Acts, RSA 358-C and 15 U.S.C. § 1692; (2) Violation of the Unfair and Deceptive Trade Practices Act, RSA 358-A; and (3) Frivolous Action in Violation of RSA 507:15 and Superior Court Rule 59 [4]. The plaintiff then filed a motion to dismiss the defendant's counterclaims [6] on October 22, 2004. However, on December 1, 2004, the Court (Barry, J.) granted the plaintiff's assented-to motion to withdraw it's motion to dismiss defendant's counterclaims, which expressly stated that the plaintiff would not re-file a motion to dismiss, but would instead, file a motion for summary judgment. See Pl.'s Assented-To Motion to Withdraw Plaintiff's Motion to Dismiss Defendant's Counterclaims [10] at ¶ 5.

Subsequently, by motion dated December 13, 2004, the defendant filed a motion for class certification and addition of representative party, seeking to "represent a class of patients of Elliot Hospital who do not have health insurance and who are or have been pursued by Elliot Hospital for rates for various forms of evaluation and treatment that are in excess of the Usual, Customary and Reasonable ("UCR") rates for the services rendered." Defendant/Plaintiff-in-Counterclaim's Motion for Class Certification and Addition of Representative Party with

---

[3] Defense counsel represented to the court that the settlement amount was for approximately $70,000.

Incorporated Memorandum of Law [13] at ¶1. On December 23, 2004, the plaintiff filed a motion for stay of all discovery [16] alleging the defendant's motion for class certification "profoundly changed the nature of this action" and the defendant's three counterclaims are "facially insufficient as a matter of law and should be dismissed." See Pl.'s Motion for Stay of All Discovery [16] at ¶¶ 2,3. The Court (Barry, J.) granted the plaintiff's request to stay discovery until its renewed motion to dismiss was filed and ruled on by the court. See Order (Jan. 3, 2005) (Barry, J.). The defendant then filed a motion to amend his counterclaims on January 12, 2005, alleging: (1) Count I- Breach of Contract and Breach of Duty of Good Faith and Fair Dealing; (2) Count II- Misrepresentation; (3) Count III- Unjust Enrichment/Constructive Trust; (4) Count IV- Violations of the State and Federal Fair Debt Collection Practices Act, RSA 358-C and 15 U.S.C. § 1692; (5) Violation of the Unfair and Deceptive Trade Practices Act, RSA 358-A; and (6) Count VI- Frivolous Action in Violation of RSA 507:15 and Superior Court Rule 59. See Defendant/Plaintiff-in-Counterclaim's Motion to Amend Counterclaim [22].

The plaintiff filed a motion to dismiss the defendant's three initial counterclaims on January 21, 2005 [26]. By motion dated February 18, 2005, the plaintiff also filed an objection to the defendant's motion to amend his counterclaims, and in the alternative, a motion to dismiss all six of the amended counterclaims [30] ("Pl.'s Alternative Mot. to Dismiss"). In the February 18, 2005 motion, the plaintiff requests the court preclude the defendant from adding the three new causes of action in his motion to amend his counterclaims, asserting they are substantive amendments that are legally insufficient as a matter of law. In the alternative, the plaintiff argues that all six of the defendant's amended counterclaims are insufficient as a matter of law and should be dismissed.

4

The gravamen of the plaintiff's alternative motion to dismiss is that the instant action is a simple debt collection matter and should not be turned into a "forum for debating health care policy in general, and Elliot Hospital's pricing methodologies in particular." Pl.'s Obj. to Def.'s Mot. to Amend Counterclaim and, in the Alternative, Mot. to Dismiss Counterclaim [30] at 3. The plaintiff contends it is the defendant who breached the express terms of the agreement by failing to pay the outstanding balance for medical services it provided to the defendant. The plaintiff further asserts: (1) the defendant's charges were based on its usual and customary rates; and (2) the defendant's assertion that these rates are unreasonable and inflated is unsupported and unfounded. Therefore, the plaintiff asserts it has a legitimate debt collection action against the defendant and the defendant's counterclaims should be dismissed as a matter of law.

The defendant objects on both procedural and substantive grounds. The defendant argues the plaintiff's alternative motion to dismiss all six of the defendant's counterclaims should be denied because it is procedurally defective. The defendant also argues that all six counterclaims state a valid cause of action and should not be dismissed. Specifically, the defendant contends the plaintiff has targeted uninsured patients, like himself, charging them rates for medical services and materials that are far in excess of: amounts charged to insured patients; and the accepted industry standard Usual, Customary and Reasonable ("UCR") rates. The defendant asserts that his counterclaims state valid causes of action designed to provide relief for being overcharged and wrongfully pursued for over charges of medical services and materials while being treated at the Elliot Hospital. The defendant also maintains that the plaintiff's motion to dismiss is premature because the issues raised in his counterclaims "are rife with factual disputes" and discovery has been stayed.

Analysis

As a preliminary matter, the court turns to the defendant's assertion that the plaintiff's alternative motion to dismiss is barred because it is procedurally defective in that it was filed: (1) beyond the 30 day deadline established by Superior Court Rule 28; and (2) after the plaintiff's initial motion to dismiss was withdrawn with prejudice. Def.'s Obj. to Pl.'s Mot. to Dismiss Counterclaims [31] at 4-5. Superior Court Rule 28 provides in pertinent part: "[a]ll special pleas and brief statements shall be filed within thirty days following the return date of the writ . . . [n]o brief statement or special plea shall be afterwards received except by leave of court as justice may require." "The purpose of Superior Court Rule 28 is to provide the plaintiff with adequate notice of the defense and a fair opportunity to rebut it." Rosenzweig v. Morton, 144 N.H. 9, 12 (1999). However, the trial court has authority to waive the time limit for good cause. Keshishian v. CMC Radiologists, 142 N.H. 168, 181 (1997); Super. Ct. R. 28.

In the present case, the court finds the defendant significantly changed the posture of this case when he filed the December 13, 2004 motion for class certification and addition of representative party. The Court's December 1, 2004 order granting the plaintiff's withdrawal of its initial motion to dismiss was made prior to the defendant's filing of the class certification and therefore, does not preclude the plaintiff's subsequent filing of the alternative motion to dismiss based on both the changing posture of the case and the defendant's subsequent motion to add three additional substantive counterclaims. Furthermore, the plaintiff filed a timely motion requesting an extension to respond to the defendant's motion for class certification, in which it indicated its intent to file a renewed motion to dismiss the defendant's counterclaims. See Pl.'s Mot. for Extension at ¶ 3. The Court (Barry, J.) granted that motion, and the plaintiff then filed timely motions to dismiss. See [26, 30]. Thus, the court concludes the alternative motion to dismiss all counterclaims is not procedurally defective.

6

Next, the court addresses the plaintiff's assertion that the defendant should be precluded from introducing the three additional counterclaims because they are substantive amendments introducing three entirely new causes of action. The defendant counters that: (1) New Hampshire practice adheres to a liberal amendment of pleadings rule; (2) granting his motion to amend the counterclaim does not prejudice the plaintiff because the instant action is in the preliminary stage and no discovery has yet been conducted between the parties; and (3) granting this motion will "avoid the necessity of filing a separate action." See Def.'s Mot. to Amend Counterclaim [22].

New Hampshire generally allows the liberal amendment of pleadings "so long as the changes do not surprise the opposite party, introduce a new cause of action, or call for substantially different evidence." Kravitz v. Beech Hill Hosp., LLC, 148 N.H. 383, 393 (2002). "RSA 514:9 (1997) permits substantive amendments to pleadings when they are necessary to prevent injustice." Id. at 392. Thus, the trial court has discretion to allow substantive amendments "so long as 'the rights of parties will not be prejudiced, and that the speedy and economical administration of justice will be promoted.'" In re Proposed N.H. Rules of Civil Procedure, 139 N.H. 512, 515 (1995) (quoting Stebbins v. Ins. Co., 59 N.H. 143, 145-49 (1879)). The present case is in the early stages of litigation and no discovery has yet been conducted. Therefore, the court finds that the plaintiff is not prejudiced by the defendant's motion to amend the counterclaims to include the three additional causes of action. This conclusion also furthers the economical administration of justice. Accordingly, the defendant's Motion to Amend Counterclaim [22] is GRANTED. Therefore, the court will now consider the plaintiff's alternative motion to dismiss by addressing each of the defendant's six counterclaims *seriatim*.

Count I- Breach of Contract and Breach of Duty of Good Faith and Fair Dealing

The defendant asserts that "by accepting and admitting Mr. Boerner into its facilities for medical care, the plaintiff undertook an express and/or implied contractual obligation to charge

Mr. Boerner nor [sic] more than a fair and reasonable charge for such medical care." Def.'s Amended Counterclaim at 1. The defendant contends the contractual agreement contained an open pricing term which the plaintiff breached by charging him "inflated and discriminatory rates for medical care," which "bear no relation to the actual cost to [sic] providing the services to Mr. Boerner" Id. The defendant asserts the plaintiff's conduct constituted a breach of its duty of good faith and fair dealing by charging the defendant significantly higher rates than those charged to insured patients for the same services. Id. at 2. The defendant also alleges that the "above-mentioned breaches of contract and duty of good faith and fair dealing have proximately caused Mr. Boerner damages and losses as recoverable in law and equity within the minimum and maximum jurisdictional limits of this Court." Id.

The plaintiff counters that Count I of the defendant's amended counterclaim asserts no viable causes of action and should be dismissed as a matter of law. Specifically, the plaintiff refutes the defendant's assertion that the contractual agreement between the parties contained an "open pricing term." To the contrary, the plaintiff contends the defendant received health care services for which he expressly agreed to pay, and was charged the hospital's usual and customary charges. The plaintiff asserts its "usual and customary" charges are not "open pricing terms," but instead are non-discounted hospital rates (applicable to uninsured patients), which are derived directly from its charge master.[4] The plaintiff argues that it was the defendant who breached the contractual agreement by refusing to pay the outstanding balance for medical services provided to him on three different occasions. The plaintiff maintains it is not contractually obligated to give the defendant "the benefit of discounts off its 'usual and customary charges' that are negotiated by managed care companies or dictated by the

---

[4] During the hearing, both parties represented that the charge master is a master list of charges from which the plaintiff hospital derives its "usual and customary" billing rates.

8

government in connection with patients treated through social welfare programs such as Medicare and Medicaid." Pl.'s Obj. to Def.'s Mot. to Amend Counterclaim and, in the Alternative, Mot. to Dismiss Counterclaim [30] at 11.

a.  Breach of Contract

The interpretation of a contract is a question of law. Duke/Fluor Daniel v. Hawkeye Funding, 150 N.H. 581, 582 (2004). When interpreting a contract, the court "give[s] the language used by the parties its reasonable meaning, considering the circumstances and the context in which the agreement was negotiated, and reading the document as a whole." Id. (quoting Lawyers Title Ins. Corp. v. Groff, 148 N.H. 333, 336 (2002)). "Absent ambiguity, however, the parties' intent will be determined from the plain meaning of the language used in the contract." Id. at 583. "The law is well settled that the parties to a contract freely and openly entered into are bound by its terms, and a court cannot rewrite the contract unless the instrument fails to express the parties' intentions when they entered the agreement." Centorr-Vacuum Indus. v. Lavoie, 135 N.H. 651, 654 (1992) (quoting Lowell v. U.S. Savings Bank, 132 N.H. 719, 725 (1990)). However, "when contract terms are ambiguous, and the trial court has properly looked to extrinsic evidence to determine the intent of the parties, determining the ambiguous terms' meaning should be left to the [trier of fact] unless the meaning of the extrinsic evidence is so clear that reasonable people could only reach one conclusion." Dillman v. N.H. College, 150 N.H. 431, 434 (2003) (citing Galloway v. Chicago-Soft, 142 N.H. 752, 756 (1998)).

It is undisputed that when the defendant sought and received medical treatment from Elliot Hospital he was presented with, and signed, the agreement prior to receiving treatment. That portion of the agreement entitled "Financial Agreement and Assignment of Benefits" ("the financial agreement") states in pertinent part:

9

1.  I agree to assign any right which I may have to receive payment directly from primary and secondary third party payor(s) to the hospital for hospital services rendered. . . .

2.  In the event that claims are only partly or fully non-covered by my third party payor(s) or in the event that I have no health care coverage, I acknowledge that I have an obligation to pay for services (based on the hospital's usual and customary charges) rendered on my behalf unless expressly prohibited under laws or contracts related to hospital reimbursement. . . . If for any reason there are balances due after my third party payor has fulfilled their obligation, I understand that I am responsible.

3.  I agree to pay for any outstanding balance remaining after application of any insurance benefit payments received from third party payors.

4.  I understand that if my financial situation is such that I reasonably believe that I will be unable to pay the entire balance due upon my receipt of the hospital's bill, I should notify the hospital at the time of registration to discuss alternative payment arrangements and the possibility of eligibility for any available subsidized care programs.

Def.'s Obj. to Pl.'s Mot. to Dismiss Counterclaims [31], Ex. D.

Section 2 of the financial agreement expressly states that the defendant acknowledges his obligation to pay for medical services provided by the plaintiff "based on the hospital's usual and customary charges." The defendant does not dispute that the plaintiff hospital's "usual and customary charges" are derived from gross Charge Master prices. See Def.'s Mot. to Amend Counterclaim at 3. The court finds the financial agreement expressly and unambiguously notified the defendant of his obligation to pay the plaintiff's usual and customary charges should he agree to receive treatment at the plaintiff's facility. Thus, the clear intent of the financial agreement was that: (1) the defendant, as an uninsured patient, would be responsible for paying the entire outstanding balance for services provided by the plaintiff; and (2) the charges would be based on the plaintiff hospital's usual and customary charges as listed on the charge master. The defendant

10

was free to decline to sign the financial agreement and seek medical treatment at a different facility. Instead, the defendant sought treatment and signed the financial agreement on three separate occasions. Thus, the court finds that the defendant knowingly agreed to the express terms of the financial agreement and entered into a valid contract with the plaintiff on all three occasions.

The court is not persuaded by the defendant's assertion that the plaintiff's act of accepting and admitting the defendant into its facilities created an implied contractual obligation to charge no more than a fair and reasonable rate for the medical services provided to the defendant. The agreement and the financial agreement contain no such implied obligation. The court finds the financial agreement expressly states the basis for the plaintiff's charges, namely its usual and customary charges as reflected in its charge master. Not only did the defendant sign the agreement, but there is no indication that he requested an estimate or questioned what the plaintiff's usual and customary charges were prior to signing the agreement. Therefore, the court finds the defendant failed to allege sufficient facts to support this allegation.

Nor is the court persuaded by the defendant's contention that the plaintiff breached the contract because its usual and customary charges are unreasonable, inflated, and discriminatory when compared with the amounts charged to insured patients receiving similar medical services. To support his assertion, the defendant relies on information obtained from the Standard & Poors and Moody's Financial Reports for Elliot Hospital ("Financial Report"), detailing the "Sources of Revenue by Payor." See Def.'s Obj. to Pl.'s Mot. to Dismiss Counterclaims [31] at 12 & Ex. E. The defendant argues that the financial report indicates that "for the four (4) years 2000-2003, "Payors" such as Mr. Boerner, denominated as "Self Pay," made up only approximately 6% of the revenue per year." Id. at 12. The defendant argues, therefore, that this information proves he is being "charged at a higher rate than approximately 94% of the "Payors" at the plaintiff

11

hospital," and therefore, is being charged "well in excess of the true "usual and customary charges" charged to 94% of the other "Payors" as well as charging Mr. Boerner at a rate well in excess of the accepted industry standard Usual, Customary and Reasonable Rates." Id.

By any interpretation of the defendant's counterclaim and supporting facts, allegations, and inferences, the defendant's argument asks the court to compare the usual and customary charges the plaintiff applies to uninsured patients (such as himself) with the discounted rates the plaintiff is charging either insured patients, or those patients receiving coverage through social welfare programs such as Medicare and Medicaid. This the court declines to do. In either instance, the defendant's position overlooks that fact that these discounted rates are the result of either: (1) separate and distinct contractual arrangements, as in the case of the managed care industry; or (2) a governmental regulatory scheme, as in the case of Medicare and Medicaid. Simply put, the court agrees with the plaintiff's contention that the discounted rates to which the defendant is comparing his alleged unreasonable and inflated charges arise out of different circumstances, in the context of managed care and governmental programs, and do not purport to reflect the plaintiff hospital's "usual and customary charges" referenced in its agreement with the defendant.

The defendant fails to adequately show how these separate and distinct contracts and/or arrangements render his own contractual agreement with the plaintiff unreasonable, discriminatory, and inflated. Nowhere in the defendant's counterclaim or related pleadings does he assert that the usual and customary charges forming the basis of his outstanding bill were unreasonably higher than other uninsured, self-pay patients receiving the same medical services from the plaintiff. Nor does the defendant assert that the basis of the charges for services provided by the plaintiff to insured patients or those who receive Medicare or Medicaid is the same basis used to calculate the defendant's charges—that is the plaintiff hospital's "usual and

12

customary" charges. Rather, the sole support for the defendant's assertion is based on the financial report which identifies eight payor sources, six of which are either: managed care/other third party payors; or Medicare/Medicaid.[5] Given that the defendant makes no allegations or inferences comparing his "usual and customary charges" to those charges incurred by other self-pay patients, or patients encompassed by the "Other" payor source category—the remaining two identified payor source categories—the court cannot conclude that the defendant has stated facts sufficient to support an inference that his charge is unreasonable, discriminatory and inflated.

The court declines to opine on the current state of health care policy and hospital reimbursement in the United States and New Hampshire. This is a policy matter best left to legislative lawmakers. See In re Blanchflower, 150 N.H. 226, 229 (2003) ("[the court] will not undertake the extraordinary step of creating legislation where none exists. Rather, matters of public policy are reserved for the legislature.") (citations omitted); State v. Kidder, 150 N.H. 600, 604 (2004) ("It is not the function of the courts to create legislation. [The court] ha[s] consistently reserved matters of public policy for the legislature.") (citing In the Matter of Plaisted & Plaisted, 149 N.H. 522, 526 (2003)). However, after reviewing all relevant pleadings, the court notes that the plaintiff briefly summarized the basis for the discount rates that apply to managed care and governmental programs. See Pl.'s Alternative Mot. to Dismiss Counterclaim [30] at 12-16. Similarly, encompassed in the financial report forming the factual basis for the defendant's allegations (Def.'s Obj. to Pl.'s Mot. to Dismiss Counterclaims [31] at 12 & Ex. E) are brief descriptions of how rates are calculated for three of the listed payor sources—Medicare, Medicaid, and Anthem. Id. at A-31. These descriptions support the court's conclusion that the lower discount rates applying to managed care companies are the result of separate contractual

---

[5] The payor sources are listed as follows: Medicare; Anthem; Cigna; Other Managed Care; Medicaid; Self-Pay; Commercial Insurance; and Other.

agreements. For instance, the financial report states "[t]he reimbursement methodology under this contract [referring to Anthem] varies according to the product." Id. (referencing "different insurance products including: HMO, Point of Service ("POS"), Preferred Provider Organization ("PPO"), Federal Employee Benefit Plan and indemnity products."). The same page also briefly describes the basis for discounted rates and reimbursement applicable to Medicare and Medicaid. Therefore, the defendant's own pleadings support the court's conclusion that not all patients are charged for medical services based on the "usual and customary" charges applicable to uninsured self-pay patients such as the defendant.

The defendant has neither incurred the costs associated with purchasing insurance coverage, nor subjected himself to the contractual limitations contained in these separately negotiated contracts. Likewise, the defendant has not qualified for, and is not subject to the inherent limitations in, the government Medicare and Medicaid programs. Thus, it is not unreasonable or discriminatory that he be unable to participate in the lower discounted rates that accompany the aforementioned limitations; particularly in light of the fact that the express terms of the agreement identify the basis for the plaintiff's charges—for services provided to an uninsured patient—as being its "usual and customary" charges.

The court is also not persuaded by the defendant's contention that the plaintiff's charges are unreasonable, inflated, and discriminatory because they charge the defendant a rate in excess of the accepted industry standard UCR rates. See Def.'s Obj. to Pl.'s Mot. to Dismiss Counterclaims [31] at 12 & Ex. E. To support this assertion, the defendant apparently relies on a report, dated October 11, 2004 and generated by an independent consulting group, stating that a

portion of the defendant's outstanding balance is higher than the UCR for the area.[6] See Pl.'s Alternative Mot. to Dismiss Counterclaim [30] at Ex. C. However, even assuming, *arguendo*, that the report is accurate, it does not reflect how the UCR rates for the area compare with the accepted UCR rates for the industry as a whole. Nor does the report provide the court with any factual basis from which it could conclude this alleged disparity is "unreasonable, inflated and discriminatory." Thus, the court finds this fact, standing alone, is insufficient to support the defendant's allegation.

The defendant relies on Servidio v. Our Lady of the Resurrection Medical Center, No. 04-L-3381 (Cir. Ct., Cook County, Ill.) (Jan. 26, 2005) to support his contention that this counterclaim, as well as the remaining counterclaims, state a valid cause of action. In Servidio, uninsured plaintiffs, who were unable to pay the outstanding bills owed to the defendant hospital for medical treatment received at that facility, initiated a cause of action "pursuant to the Illinois Consumer Fraud Act, the Illinois Revenue Code, for breach of contract and unconscionable conduct." Def.'s Obj. to Pl.'s Mot. to Dismiss Counterclaims [31], Ex. A (slip op. at 1). The Servidio plaintiffs' alleged the defendant hospital: (1) charged double and triple the amounts charged to insured patients; and (2) had the "highest charge-to-cost ratio of any Chicago area hospital, 392.11%." Id. (slip op. at 2). The Servidio Court denied the defendant hospital's motion to dismiss two counts: the Violation of the Illinois Consumer Fraud Act count; and the breach of contract count. Id. at 3-10. With respect to the breach of contract claim, the Servidio Court reasoned "the plaintiffs alleged sufficient facts to state a claim that their charges were unreasonable." Id. at 10.

---

[6] The report states in pertinent part: "Overall, I fount $2,090.65 in charges to be above the UCR for the area." Pl.'s Alternative Mot. to Dismiss Counterclaim [30] at Ex. C. The report also indicated that some charges were higher than the UCR and one charge was lower than the UCR. Id.

However, the present case is distinguishable from Servidio. Whereas the Servidio plaintiffs were all uninsured patients who lacked the financial resources to pay their outstanding hospital bills, the defendant in this case was able to pay his outstanding balance from the proceeds of his third party settlement—an amount that likely contemplated the defendant's outstanding medical charges. Also, the Servidio plaintiffs alleged that charges to their accounts were double or triple the amounts charged to insured patients: whereas the defendant in this case filed his counterclaims in response to the plaintiff's initiation of the debt collection action and alleged charges that were approximately 20% more than the UCR for the area—an amount significantly smaller than that alleged in Servidio. Finally, unlike the defendant hospital in Servidio, the hospital in this case based its motion to dismiss the breach of contract claim on express contract language contained in the agreement and signed by the defendant prior to receiving treatment. Thus, the court is not persuaded by the defendant's reliance on Servidio.

For similar reasons, the court is equally unpersuaded by Turner v. Legacy Health System, No. 0412-12483 (Cir. Ct., Multnomah Cty., Or) (Dec. 7, 2004). See Def.'s Supplemental Authority on Outstanding Motions to Dismiss and Amend at Ex. B. Additionally, for reasons addressed later in this order, the court finds the defendant's reliance on Lakes Region General Hospital v. Rollins, Belknap Cty. Super. Ct., (No. 04-C-0193) (Aug. 9, 2004) (Order, Perkins, J.) is not persuasive. See infra at 28. Accordingly, for the foregoing reasons, the court finds the defendant has failed to state a valid claim for breach of contract.

b.  Breach of the duty of good faith and fair dealing

"The implied covenant of good faith and fair dealing is an example of a common law application of public policy to contract law." Harper v. Healthsource New Hampshire, Inc., 140 N.H. 770, 775 (1996). "Every contract imposes upon each party a duty of good faith and fair dealing in its performance and its enforcement." Id. (quoting Restatement (Second) of Contracts

16

§ 205 (1979)); see Lawton v. Great Southwest Fire Ins. Co., 118 N.H. 607, 612 (1978). However, in New Hampshire, "a breach of contract standing alone does not give rise to a tort action." Lawton, at 613; see Centronics Corp. v. Genicom Corp., 132 N.H. 133, 137 (1989). "If, however, the facts constituting the breach of the contract also constitute a breach of a duty owed by the defendant to the plaintiff independent of the contract, a separate claim for tort will lie." Id. (citing Busick v. Home Owners Loan Corp., 91 N.H. 257, 258 (1941)).

New Hampshire has "not merely one rule of implied good faith duty, but rather a series of doctrines, each of them serving markedly different functions." Harper, 140 N.H. at 775. Accordingly, New Hampshire recognizes a common law implied duty of good faith and fair dealing "in three distinct categories of contract cases: those dealing with standards of conduct in contract formation, with termination of at-will employment contracts, and with limits on discretion in contractual performance[.]" Centronics, 132 N.H. at 139. The defendant's counterclaim fails to identify the specific category that is applicable to this claim. However, the court notes that only the first category, contract formation, or the third category, discretion in contract performance, are applicable in this instance and it will address each category in turn.

With respect to the first category, contract formation, our Supreme Court has recognized that "[i]n . . . setting standards of conduct in contract formation, the implied good faith obligations of a contracting party are tantamount to the traditional duties of care to refrain from misrepresentation and to correct subsequently discovered error, insofar as any representation is intended to induce, and is material to, another party's decision to enter into a contract in justifiable reliance upon it." Id. In the present case, the court finds the plaintiff has made no misrepresentations to the defendant regarding its charges for the medical services provided to the

17

defendant.[7] Nor does the court find that there were any subsequently discovered errors in the agreement that required correcting. Rather, the court finds the parties entered into a contract in which: the plaintiff agreed to provide medical services to the defendant based on its usual and customary charges (as contained on the charge master); and the defendant signed the agreement, thereby assenting to pay the charges in full. Moreover, the defendant signed the agreement on two subsequent occasions after receiving the first allegedly inflated invoice. Thus, the court finds the plaintiff did not breach an implied covenant of good faith and fair dealing in the formation of the agreement.

With respect to the third category, discretion in contract performance, the New Hampshire Supreme Court has stated the following common rule:

> Under an agreement that appears by word or silence to invest one party with a degree of discretion in performance sufficient to deprive another party of a substantial proportion of the agreement's value, the parties' intent to be bound by an enforceable contract raises an implied obligation of good faith to observe reasonable limits in exercising that discretion, consistent with the parties' purpose or purposes in contracting.

Centronics, 132 N.H. at 143. Accordingly, our Supreme Court has identified the following "analytical sequence" as being applicable when considering this issue:

1. Does the agreement ostensibly allow to or confer upon the defendant a degree of discretion in performance tantamount to a power to deprive the plaintiff of a substantial proportion of the agreement's value? . . . .

2. If the ostensible discretion is of that requisite scope, does competent evidence indicate that the parties intended by their agreement to make a legally enforceable contract? . . . .

3. Assuming an intent to be bound, has the defendant's exercise of discretion exceeded the limits of reasonableness? . . . .

---

[7] The court discusses the defendant's counterclaim asserting misrepresentation in a later section of this order. See infra at 20-22.

18

> 4. Is the cause of the damage complained of the defendant's abuse
> of discretion, or does it result from events beyond the control
> of either party, against which the defendant has no obligation
> to protect the plaintiff? . . . .

Id. at 144. With respect to the first of the four issues identified in the aforementioned analytical

sequence, the Centronics Court recognized that "[c]ontracts may be broken in a multitude of

ways and theories of relief are correspondingly numerous, but the concept of good faith in

performance addresses the particular problem raised by a promise subject to such a degree of

discretion that its practical benefit could seemingly be withheld." Id.

Therefore, the central issue in this analysis is whether the agreement gave the plaintiff

such a degree of discretion—to base its rates on its "usual and customary charges"—that it

provided, or was in danger of providing, essentially no practical benefit to the defendant. The

court finds it does not. The defendant came to the plaintiff's facility for treatment. The defendant

was then presented with the agreement, which he reviewed and signed. The agreement clearly

identifies the basis for the plaintiff's rates as being the hospital's usual and customary charges

when a patient is uninsured. After signing the agreement, the defendant received complete

medical care from the plaintiff. The defendant then subsequently refused to pay the balance due.

Moreover, the defendant sought treatment from the plaintiff on two subsequent occasions after

having received a bill the defendant now claims is "inflated and discriminatory." Thus, the court

finds the defendant knowingly entered into the agreement (on three occasions) and received the

full benefit of that contract. The defendant cannot now claim that the terms were so discretionary

as to withhold any practical benefit from the agreement. To the contrary, the defendant has

received the full benefit of the agreement while the plaintiff has recovered no portion of the

outstanding balance. See Burton v. William Beaumont Hospital, No. 04-72735 (E.D. Mich.)

(June 20, 2005) (slip op. at 19-22) (recognizing the plaintiff suffered no economic damages and

19

the non-economic damages actually arose out of the plaintiffs' failure to pay the outstanding medical charges). Thus, the court finds the defendant has failed to satisfy the first step of the sequential analysis, and therefore, his claim for breach of the duty of good faith and fair dealing, with respect to the third category, is invalid.

Accordingly, for the foregoing reasons, the plaintiff's motion to dismiss Count I of the defendant's amended counterclaim, alleging breach of contract and breach of duty of good faith and fair dealing, is GRANTED.

Count II- Misrepresentation

Count II of the defendant's amended counterclaim asserts "[t]he plaintiff hospital misrepresented the rates to be charged Mr. Boerner as being fair and reasonable when they were not and this constitutes a material misrepresentation of fact relating to the goods and services provided and the amounts charged for the same[.]" Def.'s Amended Counterclaim at 2. The plaintiff contends this claim fails to allege an actionable misrepresentation of fact. The plaintiff argues that the defendant's assertion attacks the "reasonableness" of the plaintiff's "usual and customary" charges while failing to allege facts sufficient to support a claim for either intentional or negligent misrepresentation.[8] The court agrees with the plaintiff.

a.  Intentional Misrepresentation

To establish the tort of intentional misrepresentation, or fraud, "a plaintiff must prove that the defendant made a representation with knowledge of its falsity or with conscious indifference to its truth with the intention to cause another to rely upon it." Snierson v. Scruton, 145 N.H. 73, 77 (2000) (citing Patch v. Arsenault, 139 N.H. 313, 319 (1995)). "In addition, a plaintiff must demonstrate justifiable reliance." Id. "In order to withstand a motion to dismiss, the plaintiff

---

[8] The court notes that the defendant fails to identify which form of misrepresentation he is alleging and consequently, relies on the same arguments to support both an intentional misrepresentation and negligent misrepresentation claim. Therefore, the court will address both forms of misrepresentation.

must specify the <u>essential details</u> of the fraud, and <u>specifically allege</u> the facts of the defendant's fraudulent actions . . . . It is not sufficient for the plaintiff merely to allege fraud in general terms." <u>Jay Edwards, Inc. v. Baker</u>, 130 N.H. 41, 46-7 (1987) (citing <u>Proctor v. Bank of New Hampshire</u>, 123 N.H. 395, 399 (1983)) (emphasis in the original).

In this case, the court finds the defendant has failed to allege sufficient specific facts to support an intentional misrepresentation claim. The defendant makes the general allegation that by virtue of admitting and treating the defendant at its facility, the plaintiff in some way represented, either expressly and/or impliedly, that its charges would be fair and reasonable. However, the defendant identifies no affirmative statement or action that supports this allegation. Nor does he identify a specific hospital representative, employee or document as the source of the alleged misrepresentation. Rather, the defendant relies on the general assertion that the agreement somehow implies that the hospital's rates would be fair and reasonable. To support this assertion, the defendant urges the court to interpret "usual and customary" as implying "fair and reasonable." The court declines to do so. <u>Duke/Fluor Daniel</u>, 150 N.H. at 582 (recognizing the court gives contract language its reasonable meaning when interpreting the contract).

The financial agreement expressly states that the defendant would be charged for medical services based on the plaintiff hospital's "usual and customary" charges and the defendant does not dispute that the charges at issue reflect the plaintiff's "usual and customary" rates. However, the fact that those "usual and customary" rates are higher than discounted rates charged to other insured patients or patients covered by Medicare or Medicaid is insufficient to support the defendant's generalized allegation that the plaintiff misrepresented its charge rates. Thus, the court finds that the aforementioned generalized allegations of an express or implied misrepresentation are insufficient to support the defendant's claim of intentional misrepresentation.

21

### b. Negligent Misrepresentation

"The elements of [a negligent misrepresentation] cause of action are a negligent misrepresentation of a material fact by the defendant and justifiable reliance by the plaintiff." Snierson, 145 N.H. at 78 (citing Hydraform Prods. Corp. v. American Steel & Alum. Corp., 127 N.H. 187, 200 (1985)). As previously stated, the court finds the defendant has failed to plead sufficient facts to support his allegation that the plaintiff made a misrepresentation to the defendant regarding the basis for its charges. Moreover, even assuming, *arguendo*, that the plaintiff "misrepresented" its charges, the court cannot find the defendant has plead any specific facts from which the court could conclude that the "misrepresentation" was made for the purpose of causing the defendant to rely on it. Therefore, the court finds the defendant has failed to state a claim for negligent misrepresentation.

Accordingly, for the foregoing reasons, the plaintiff's motion to dismiss Count II of the defendant's amended counterclaim, alleging misrepresentation, is GRANTED.

### Count III- Unjust Enrichment/Constructive Trust

In his amended counterclaim, the defendant asserts the plaintiff will be unjustly enriched by: (1) the plaintiff's "charging and collecting inflated rates" from the defendant; (2) "virtue of the alleged debts Mr. Boerner allegedly owes which even if not paid in full, have value to the plaintiff hospital;" and (3) virtue of using the inflated charges, or debt, to obtain tax advantages and better negotiated discounts with third party payors. See Amended Counterclaim at 3. The defendant also alleges that he and "numerous others have suffered economic injury and other damages as approximate and direct consequence and cause of the plaintiff hospital's unjust enrichment." Id. The defendant then asserts that "Mr. Boerner and numerous others are entitled to the imposition of a constructive trust on the difference between the amount that the plaintiff

22

hospital has charges [sic] Mr. Boerner and numerous others and the amount that it has charged its uninsured patients and others for the same of similar services . . . ." Id. at 3-4.

a.  Unjust Enrichment

"Unjust enrichment is an equitable as opposed to a legal concept." Kowalski v. Cedars of Portsmouth Condo. Ass'n, 146 N.H. 130, 132 (2001). "The theory is based on the concept that fairness requires restitution to the injured party." Id. An individual may be required to "make restitution for unjust enrichment if he has received a benefit which would be unconscionable for him to retain." Id. at 133 (quoting R. Zoppo Co., Inc. v. City of Manchester, 122 N.H. 1109, 1113 (1982)). "To entitle one to restitution, it must be shown that there was unjust enrichment either through wrongful acts or passive acceptance of a benefit that would be unconscionable to retain." Id. (quoting Cohen v. Frank Developers, Inc., 118 N.H. 512, 518 (1978)); see also In Re: Haller, 150 N.H. 427, 430 (2003).

In the present case, under any reading of the defendant's counterclaims, the court cannot conclude that the plaintiff hospital has received a benefit as a result of the defendant's non-payment of his outstanding balance. Rather, the court finds it is the plaintiff hospital, not the defendant, that has suffered economic injury by incurring the costs of providing medical services to the defendant without receiving payment for those services. Therefore, the court finds it is the defendant who would unjustly benefit should the court grant him the relief he requests. Additionally, the court finds the defendant's position particularly misguided given that he failed to make any effort to comply with section 4 of the financial agreement, which expressly: (1) required that the defendant notify the hospital, upon receipt of the bill, if he reasonably believed he would be unable to pay the entire amount; and (2) identified the possibility of making alternative arrangements should he be unable to pay the outstanding balance.

23

Moreover, even if the court determined the plaintiff's charges were unreasonably high, and/or not reflective of it's "usual and customary" charges, unjust enrichment would not be an applicable remedy given that the hospital has received no economic benefit from the defendant in this matter. The defendant's attempt to circumvent this fact, by: (1) claiming that the plaintiff receives other benefits, such as tax advantages and improved negotiated discounts with third party payors, by virtue of the alleged "inflated rates;" and (2) referring to "others" who have allegedly been overcharged by the plaintiff is misplaced. The fact remains that the plaintiff has received no benefit from Mr. Boerner, the defendant in this matter. While the defendant asserts he "is not interested . . . in a policy debate about payment for health insurance" but instead "is interested in relief for being overcharged and wrongfully pursued for over charges of medical services and materials," his amended counterclaims and relevant pleadings belie this assertion. This is a debt collection action based on an underlying contract (the agreement) and vague generalized references to other parties and other benefits the plaintiff may have received as a result of other agreements are not relevant to the issues in this case. Therefore, the court finds the defendant has failed to state a valid claim for unjust enrichment.

b. Constructive Trust

"A constructive trust may only be imposed when clear and convincing evidence demonstrates a confidential relationship existed between two people, that one of them transferred property to the other, and that the person receiving the property would be unjustly enriched by retaining the property, regardless of whether the person obtained the property honestly." Cadle Co. v. Bourgeois, 149 N.H. 410, 419-20 (2003) (citing In re Estate of Cass, 143 N.H. 57, 60 (1998)). Therefore, in New Hampshire, the imposition of a constructive trust requires a transfer of property. See 7 DeGrandpre, New Hampshire Practice Wills, Trusts and Gifts § 30.14, at 389-

24

396 (2003) (identifying six instances that can lead to the imposition of a constructive trust; all involving a transfer of property).[9]

In this case, the court finds that there was no transfer of property from the defendant to the plaintiff hospital. The defendant does not dispute that he has not paid any portion of the outstanding balance. Furthermore, the conduct identified in the aforementioned six instances, which can lead to the imposition of a constructive trust, is absent in this case. Additionally, as previously stated, the plaintiff has received no benefit as a result of the defendant's refusal to pay the outstanding balance such that the court could conclude that it has been unjustly enriched. Again, the court is not persuaded by the defendant's vague and unsupported allegations that the plaintiff has derived secondary benefits from the defendant's and other uninsured patients' nonpayment, such that a constructive trust should be established to allow the defendant, and other uninsured patients, to receive the benefit of those alleged secondary benefits. This would allow the defendant (and other uninsured patients) to be reimbursed for expenses they did not pay, thereby allowing the defendant to be unjustly enriched. Therefore, the court finds that the defendant has failed to state a valid claim for the establishment of a constructive trust.

Accordingly, for the foregoing reasons, the plaintiff's motion to dismiss Count III of the defendant's amended counterclaim, alleging unjust enrichment/constructive trust, is GRANTED.

Count IV- Violations of the State and Federal Fair Debt Collection Practices Acts (RSA 358-C and 15 U.S.C. § 1692

In his amended counterclaim, the defendant asserts the plaintiff has engaged in "numerous and various" violations of the federal Fair Debt Collection Practices Act, 15 U.S.C. § 1692 ("FDCPA") as well as the state Unfair, Deceptive or Unreasonable Collection Practices

---

[9] The six instances are: (1) transfer of real property subject to an oral promise to re-convey where that promise is not fulfilled; (2) acquisition of title to property pursuant to a mistake; (3) acquisition of property through fraud, duress, or undue influence; (4) obtaining title to property by homicide; (5) acquiring property in violation of a fiduciary duty; and (6) acquiring property through abuse of a confidential relationship.

25

Act, RSA 358-C ("UDUCPA"). To that end, the defendant identifies the following specific

violations of both the FDCPA and UDUCPA, alleging the plaintiff:

1) Pursued improper debt collection during the course of settlement negotiations between the parties;

2) Failed to properly communicate, confirm, narrow and explain the nature of the debt and the basis for claiming a greater amount of debt against an uninsured patient as opposed to an insured patient;

3) Failed to properly follow the law relating to communications with the debtor and validation and explanation of the claimed debt;

4) Harassed the defendant by commencing the instant action despite an agreement to reasonably negotiate a settlement upon completion of the third party personal injury claim;

5) Threatened the instant action if the defendant debtor did not sign documents recognizing full legal responsibility for an "improperly and unlawfully inflated debt;

6) Attempted to force the defendant to sign documents recognizing the full amount of the debt as being higher than it lawfully should be; and

7) Engaged in the aforementioned acts and practices in a willful and knowing manner.

Def.'s Amended Counterclaim at 4-5.

The plaintiff disagrees, contending the defendant's assertions are insufficient as a matter of law because the FDCPA and UDUCPA apply only to "debt collectors;" a term which does not apply to the plaintiff, an entity collecting its own valid consumer debt in its own name. The plaintiff also asserts that the defendant's claim does not meet the statutory requirements of either the FDCPA or the UDUCPA.

In matters of statutory interpretation, the Court first examines the language of the statute and ascribes the plain and ordinary meanings to the words used. Thayer v. Town of Tilton, 151 N.H. 483, 486 (2004). "[The court] must keep in mind the intent of the legislation, which is determined by examining the construction of the statute as a whole, and not simply by examining

26

isolated words and phrases found therein." Id. at 486-87 (citing JTR Colebrook v. Town of Colebrook, 149 N.H. 767, 770 (2003)).

### a.  The Federal Statute (FDCPA)

The purpose of the FDCPA is "to eliminate abusive debt collection practices by debt collectors. . . ." 15 U.S.C. § 1692(e) (emphasis added). "The term 'debt collector' means any person who uses any instrumentality of interstate commerce or the mails in any business the principal purpose of which is the collection of any debts, or who regularly collects or attempts to collect, directly or indirectly, debts owed or due or asserted to be owed or due another." 15 U.S.C. § 1692a(6).

In the present case, the court finds the plaintiff is not a "debt collector" within the meaning of the FDCPA. Elliot Hospital's principal purpose is not debt collection. In this instance, the plaintiff is attempting to collect a debt (incurred by the defendant) in its own name. Furthermore, the defendant has asserted no facts from which the court could conclude that the plaintiff hospital attempts to collect debts owed to other entities. The defendant counters that the plaintiff hospital's non-disclosed unfair, unreasonable and inflated rates violated three different sections of the FDCPA, namely: section 1692g(a)(1) (relating to misstating the amount of the debt or pursuing recovery for an improper amount of the debt); (2) 1692e (prohibiting use of any false deceptive, or misleading representation in connection with debt collection); and (3) 1692f(1) (pertaining to attempts to collect an amount of debt that is unauthorized or improper). See Def.'s Obj. to Pl.'s Mot. to Dismiss Counterclaims [31] at 17. However, the court finds this reliance is misplaced given that the three aforementioned sections are not applicable unless the entity  qualifies as a "debt collector" within the meaning of section 1692a(6). Therefore, the court finds the plaintiff's attempts to collect the amount owed by the defendant are not covered by the FDCPA.

27

This determination comports with other federal courts that have dismissed federal FDCPA claims in similar cases. See Darr v. Sutter Health, No. C 04-02624 WHA (N.D. Cal Nov. 30, 2004) (slip opinion); Burton v. William Beaumont Hospital, No. 04-72735 (E.D. Mich. Dec. 3, 2004) (slip opinion). In both instances, uninsured patients initiated multiple claims, including alleged violations of the FDCPA, against the hospitals that provided them with medical treatment; and in both cases the FDCPA claims were dismissed. See Darr, (slip. op. at 7-8) (recognizing that the FDCPA was enacted to target independent debt collectors and determining that an entity suing in its own name to collect its own debt is not covered by the FDCPA); Burton, (slip op. at 18) (recognizing that the statutory definition of "debt collector" "does not apply to a creditor that is collecting in its own name).

Moreover, the court is not persuaded by the defendant's reliance on Lakes Region General Hospital v. Rollins, Belknap Cty. Super. Ct., (No. 04-C-0193) (Aug. 9, 2004) (Order, Perkins, J.). The defendant asserts the issues forming the basis of the plaintiff hospital's motion to dismiss in Rollins are squarely on point with this case. However, the Court (Perkins, J.) summarily denied the plaintiff's motion to dismiss without an explanation or legal analysis. A review of the plaintiff hospital's motion to dismiss in Rollins reveals that the plaintiff did not raise the issue of whether it is considered a "debt collector" for the purposes of section 1692a(6) of the FDCPA in its motion to dismiss. Moreover, the Court (Perkins, J.) denied the motion to dismiss without the benefit of either Darr or Burton, two cases that directly addressed why the FDCPA does not apply to hospitals attempting to collect debts in their own name. See supra at 27-28. Thus, for the foregoing reasons, the court concludes the defendant has failed to state a valid counterclaim for violation of the FDCPA, 15 U.S.C. § 1692.

### b.  The State Statute (UDUCPA)

The UDUCPA, prohibits unfair, deceptive or unreasonable debt collection practices. RSA 358-C:2 (1995). The UDUCPA applies to "debt collectors" and distinguishes between debt collection arising from "consumer credit transactions" and debt collection arising from a "consumer transaction." RSA 358-C:1, VIII (a) & (b) respectively. Therefore, the court must first determine whether the transactions memorialized by the three financial agreements constituted "consumer credit transactions" or a "consumer transaction" within the meaning of the UDUCPA.

A "consumer credit transaction" is a transaction between a creditor and a consumer in which services are acquired on credit and the consumer's obligation is payable in 4 or more installments. See RSA 358-C, II. However, a "consumer transaction" encompasses a transaction between a consumer and a person who "provides . . . services . . . to consumers." RSA 358-C, III. Thus, in the context of this case, the three financial agreements memorialized three separate "consumer transactions" in which the plaintiff provided medical services to the defendant.[10]

In the context of a consumer transaction, the UDUCPA defines a debt collector as "[a]ny person who, for any fee, commission or charge other than wages or salary, engages in any direct or indirect action, conduct or practice to enforce or attempt to enforce an obligation that is owed or due, or alleged to be owed or due, by a consumer . . . ." RSA 358-C:1, VIII(b) (emphasis added). The court finds that the plain language of the UDUCPA limits the scope of the act to debt collectors who receive a fee or commission to collect debts for others. Here, the plaintiff did not receive a fee, commission or charge to collect the outstanding balance owed by the

---

[10] The court notes that the defendant apparently declined to negotiate a consumer credit transaction pursuant to the agreement given that he did not notify the plaintiff, pursuant to section 4 of the financial agreement, that he would be unable to pay the outstanding balance due and discuss alternative payment arrangements.

defendant. Rather, the court finds the plaintiff hospital was attempting to collect a debt in its own name, and therefore is not a "debt collector" for the purposes of the UDUCPA.

Similar to the argument raised by the defendant with regard to the federal statute, the defendant asserts the plaintiff hospital's alleged inflated and unreasonable charges violated the UDUCPA by attempting to collect improper amounts owed, misstating the amounts owed, or overstating the amounts owed pursuant to RSA 358-C:3, VII and X. See Def.'s Obj. to Pl.'s Mot. to Dismiss [7] at ¶ 4. The court is not persuaded by the defendant's aforementioned assertion. RSA 358-C:3 applies to a "debt collector," and therefore, does not apply to this case given that the court has concluded that the plaintiff is not a "debt collector" for the purposes of the UDUCPA.

Accordingly, for the foregoing reasons, the plaintiff's motion to dismiss Count IV of the defendant's amended counterclaim, alleging violations of the Federal and State Fair Debt Collection Practices Acts is GRANTED.

### Count V- Violation of the Unfair and Deceptive Trade Practices Act (RSA 358-A)

In addition to incorporating his previous allegations, the defendant essentially asserts the plaintiff's act of charging uninsured patients unreasonable and inflated rates (as compared with discounted rates charged to insured patients), and its failure to inform the defendant of its pricing methodologies constitutes an unfair and deceptive trade practice in violation of RSA 358-A. Def.'s Amended Counterclaim [22] at 5. The defendant claims the aforementioned unfair and deceptive trade practices were willful and knowing and seeks compensatory damages as enumerated in RSA 358-A:10, I.

The plaintiff counters that the defendant's assertions do not: "(a) fall within one of the fifteen enumerated bad acts specified by the statute; (b) 'attain a level of rascality that would raise an eyebrow of someone inured to the rough and tumble of the world of commerce' . . . ; or

30

(c) [fall] within the ambit of the trade practices act by virtue of some other statute, such as the debt collection statute." Pl.'s Mot. to Dismiss all Counterclaims [26] at 8-9. Therefore, the plaintiff contends Count V of the defendant's amended counterclaim should be dismissed because it fails to state a valid cause of action. The court agrees with the plaintiff.

The Unfair and Deceptive Trade Practices Act, RSA ch. 358-A ("UDTPA") proscribes unfair or deceptive trade practices in general as well as setting forth specific types of conduct that qualify as unfair or deceptive trade practices. State v. Moran, 151 N.H. 450, 452 (2004); RSA 358-A:2 (Supp. 2004). The UDTPA lists fifteen enumerated acts that are specifically prohibited. See RSA 358-A:2, I - XIV. In the interests of judicial economy, the court declines to list all fifteen of the specifically enumerated acts. However, the court has individually reviewed and considered each of these acts in the context of the instant action. Accordingly, the court finds that the defendant's allegations do not come under the purview of any of the express provisions of the UDTPA. Therefore, the court must now consider whether the defendant's allegations fall within the UDTPA's general prohibition of unfair or deceptive trade practices.

The UDTPA's general provision is broadly worded, and not all conduct in the course of trade or commerce falls within its scope." Moran, 151 N.H. at 452 (citing Barrows v. Boles, 141 N.H. 382, 390 (1996)). However, the New Hampshire Supreme Court has stated that "in order for conduct not particularized by the enumerated categories in the CPA[11] to qualify as an unfair or deceptive trade practice, that conduct must be of the same type as proscribed by the enumerated categories." Id. (citing Barrows, 141 N.H. at 390) (emphasis in the original). "Because of the difficulty often associated with determining which commercial actions, not specifically delineated, are covered by the act, [the court] employed the rascality test in Barrows." Id.; see Milford Lumber Co. v. RCB Realty, 147 N.H. 15, 17 (2001). "Under the

---

[11] "CPA" represents the Consumer Protection Act, which is also known as the UDTPA.

rascality test, the objectionable conduct must attain a level or rascality that would raise an eyebrow of someone inured to the rough and tumble of the world of commerce." Id. (quoting Milford Lumber Co., 147 N.H. at 17). In interpreting the rascality test, our Supreme Court has looked to the federal courts' interpretation of the Federal Trade Commission Act for guidance while recognizing that the Federal Trade Commission determines if actions are unfair or deceptive by inquiring into:

> (1) whether the practice, without necessarily having been previously considered unlawful, offends public policy as it has been established by statutes, the common law, or otherwise – whether, in other words, it is within at least the penumbra of some common-law statutory or other established concept of unfairness; (2) whether it is immoral, unethical, oppressive, or unscrupulous; (3) whether it causes substantial injury to consumers (or competitors or other businessmen).

Milford Lumber, 147 N.H. at 19.

In Barrows, the plaintiff's appeal of the trial court's determination that the defendant did not violate the CPA arose "in the context of a complex procedural scenario" involving lender liability, contract, and bankruptcy. 141 N.H. at 383. In affirming the trial court's decision, the Barrows Court recognized that the defendants had "'sweetened' the terms of the loan," but reasoned that "selfish bargaining" and business dealings are insufficient to justify a claim for damages under the CPA. Id. at 390. In Milford Lumber, our Supreme Court affirmed the trial court's determination that the defendant's actions violated the CPA. 147 N.H. at 16. The Milford Lumber Court acknowledged that "an ordinary breach of contract claim does not present an occasion for the remedies under the [CPA]." Id. at 19 (quoting Barrows, 141 N.H. at 390). However, the Milford Lumber Court reasoned that the defendants' use of "intentionally vague misrepresentations" as a "basis for completely disclaiming liability for the goods was "unethical and unscrupulous activity" that "would be harmful for commerce in New Hampshire." Id. at 19-

32

20. Similarly, in affirming the trial court's decision that the defendant's actions violated the CPA, the Moran Court reasoned that the defendant did not simply fail to perform his duties under the contract; rather, he made continuous ongoing misrepresentations that induced the plaintiff to pay for materials when the defendant clearly did not intend to perform the work. Moran, 151 N.H. at 453-45.

Thus, it is clear that our Supreme Court interprets the rascality test as requiring some affirmative deceptive act or misrepresentation that induces reliance by the aggrieved party. In the present case, the court finds the defendant failed to plead sufficient facts to support his allegation that the plaintiff's actions violated the UDTPA. The court has previously determined that the defendant's counterclaims alleging breach of contract and misrepresentations were unsupported by the facts as alleged in the defendant's amended counterclaim. Absent any breach of contract or misrepresentations, the court finds the plaintiff's actions fail meet the threshold requirements of the rascality test. Therefore, the court finds the defendant's allegations that the plaintiff has violated the general provisions of the UDTPA are unsupported and unfounded. Furthermore, the court has already determined the plaintiff's alleged actions do not violate RSA 358-C, the state unfair, deceptive or unreasonable debt collection practices act. See supra at 28-30. Therefore, the defendant's reliance on RSA 358-C:4, VI, as a basis for his counterclaim alleging violations of the UDTPA is misplaced.

Accordingly, for the foregoing reasons, the plaintiff's motion to dismiss Count V of the defendant's amended counterclaim, alleging violations of the Unfair and Deceptive Trade Practices Act (RSA 358-A) is GRANTED.

Count VI- Frivolous Action in Violation of RSA 507:15 and Superior Court Rule 59

Finally, the defendant asserts the plaintiff initiated this cause of action "only for the purposes of harassment and intimidation" and therefore, the plaintiff's claim constitutes a

33

frivolous action in violation of both RSA 507:15 and Superior Court Rule 59. Def.'s Amended Counterclaim at 6.  Specifically, the defendant argues the plaintiff "insisted upon the defendant's signing of documents recognizing an amount of debt which is unfair and improper and otherwise refused to accept the defendant's counsel's letter stating agreement to resolve this matter on a reasonable basis following resolution of the underlying personal injury case and even waiving the statute of limitation." Id. The plaintiff disagrees, alleging Count VI of the defendant's amended counterclaim is both procedurally and substantively defective. Specifically, the plaintiff asserts this counterclaim is procedurally defective in that it may not be filed unless and until the defendant is successful in the underlying action; which is not the case in this instance. The plaintiff also contends the defendant's allegation does not meet the substantive standard prescribed by the statute.

RSA 507:15 (1997) provides in pertinent part:

> If, upon the hearing of any contract or tort action, it clearly appears to the court that the action of any defense is frivolous or intended to harass or intimidate the prevailing party, then the court, upon motion of the prevailing party or on its own motion, may order . . . [reasonable] costs and attorneys' fees . . . plus $1,000 to be paid to the prevailing party . . . .

Superior Court Rule 59 grants the court authority to assess reasonable costs and attorneys' fees "against any party whose frivolous or unreasonable conduct makes necessary the filing of or hearing on any motion." The defendant is not the prevailing party in the instant action. To the contrary, the court finds the defendant has not prevailed on any of his amended counterclaims, and has granted the plaintiff's motion to dismiss. Nor can the court conclude that the plaintiff's debt collection action qualifies as a frivolous and unreasonable claim. It is undisputed that the defendant agreed, pursuant to an express contract, to pay the outstanding balance—based on the plaintiff hospital's usual and customary charges—for medical services provided to the defendant

34

by the plaintiff on three separate occasions. The plaintiff complied with all portions of the agreement whereas the defendant refused to pay the outstanding balance, alleging the charges are unreasonable and inflated as compared to discounted rates charged to insured patients. Thus, the court finds the plaintiff hospital's underlying debt collection is neither frivolous nor unreasonable.

The defendant appears to assert that since he entered into good faith settlement negotiations with the plaintiff, the plaintiff's debt collection action was unreasonable and frivolous. However, after reviewing the supporting documents, the court cannot conclude that there is any factual basis supporting the defendant's assertion that the parties had "agreed to resolve matters." Def.'s Amended Counterclaim at 6; see also Def.'s Obj. to Pl.'s Mot. to Dismiss [7] at Ex. B. By letter dated July 16, 2003, the plaintiff attempted to obtain a letter of protection from the defendant, while agreeing to wait for payment of the balance due until the defendant's thirty party claim was resolved. By letter dated May 10, 2004, the defendant declined to sign the plaintiff hospital's letter of protection and offered an alternative letter of protection. By letter dated May 20, 2004, the plaintiff notified the defendant that it did not agree with the defendant's alternative proposed letter of protection. The parties then corresponded on multiple subsequent occasions and it is apparent that at no time did the parties "agree to resolve matters." See id. Thus, the court cannot conclude that the plaintiff's initiation of the instant action after multiple failed attempts to resolve this matter through settlement negotiations is either unreasonable or frivolous. There is simply no factual support in the record for the defendant's assertion that the plaintiff unreasonably and frivolously initiated the instant action after "agree[ing] to resolve matters."

35

Accordingly, for the foregoing reasons, the plaintiff's motion to dismiss Count VI of the defendant's amended counterclaim, alleging Frivolous Action in Violation of RSA 507:15 and Superior Court Rule 59 is GRANTED.

SO ORDERED.

Date: July 15, 2005

James J. Barry, Jr.
Presiding Justice

36

# EXHIBIT B

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Case No. 05-22409-Civ-Seitz/McAliley

BARBARA COLOMAR, On Behalf of Herself
and All Others Similarly Situated,

      Plaintiff,

vs.

MERCY HOSPITAL, INC. and
CATHOLIC HEALTH EAST, INC.,

      Defendants.

_____/

## AFFIDAVIT OF DAVID KEEBLER

DAVID KEEBLER, being first sworn and cautioned on his oath, states as follows:

1.    I am the Director of Patient Access at Mercy Hospital, Inc. ("Mercy"). I have held this position continuously since December 1997, and thus I have personal knowledge of: (1) Mercy's policies and practices for patient admissions and patient billing, and (2) Mercy's long-standing commitment to charity care for the uninsured and underinsured. All of the following statements are true and correct based on my own personal knowledge.

2.    Mercy is the only Catholic hospital in Miami-Dade County, Florida. Consistent with its Catholic healthcare mission, Mercy provides a significant amount of healthcare for the uninsured and underinsured in this community who lack the financial resources to pay. In 2004, for example, 54,809 uninsured and underinsured persons received free or reduced rate care from Mercy and its physicians. The medical care provided to these patients cost Mercy over $15.0 million. Direct patient care for indigent patients alone cost Mercy $2.1 million. Non-reimbursed medical care for patients in public programs cost Mercy $6.0 million over program funding. The State of Florida indigent care program assesses hospitals 1.5% of net patient revenues, which added non-reimbursed costs of

$2.66 million in 2004.  In addition, Mercy wrote off $4.8 million for the working poor who were uninsured or underinsured and unable to pay for their care received at Mercy. Regardless of whether a patient can pay, Mercy treats every patient who presents an emergency medical condition, and Mercy provides the patient the same level of care whether or not there is insurance.  Mercy must provide emergency room care in this manner by statute, and it would do so in any event under its Catholic healthcare mission. Mercy has provided similar levels of treatment and incurred similar costs in 2003 and 2002.

3.     Mercy provides financial counseling to any patient who asks Mercy for such counseling, or indicates to Mercy that she is uninsured and unable to pay.  In addition, as Florida law requires now and at the time of the Plaintiff's admission, Mercy has posted the *Florida Patient's Bill of Rights* in each hospital patient registration area.  That posting, in both English and Spanish, advises patients of their right to receive financial counseling and a reasonable estimate of charges for their medical care upon request. *See, e.g., Florida Patient's Bill of Rights*, Fla. Stat. § 381.026(6).  Patients admitted for in-patient treatment, such as the Plaintiff, also receive from Mercy a printed *Patient Information Guide*, which also informs the patient of her right to financial counseling and an estimate of her charges.

4.     As part of its financial counseling, Mercy will give uninsured patients who indicate they are unable to pay: (1) an application and (2) the list of information that the patient must provide to be considered for Mercy's charity care program.  To prevent abuse of Mercy's charity care program, the patient must verify that her household assets and income meet the program guidelines with a financial affidavit and copies of her tax returns, paycheck stubs, utility bills, etc.  Mercy reviews the patient's financial information to establish program eligibility, and even if the patient does not qualify for 100% charity care, Mercy will often in its discretion offer to reduce charges and/or write-off a significant portion

2

of the outstanding balance owed to Mercy by patients who demonstrate financial need. Conversely, those patients whose financial information shows that they have the ability to pay for their medical care will not be considered eligible for Mercy's charity care program.

5.      Even for patients (such as the Plaintiff) who do not claim to be uninsured and do not seek eligibility under Mercy's charity care program, Mercy will often elect as part of its pre-suit collections process to offer the patient a payment plan that takes into account her ability to pay.  Because Mercy *never* charges interest on outstanding balances and delinquent accounts, these interest-free payment plans are economically equivalent to a reduction of the patient's charges.  Mercy's billing records that I have personally reviewed confirm that the Plaintiff was offered and agreed to such an interest-free payment plan. Under the plan, she has agreed to make monthly payments toward the amount owed. Mercy's records further show that the Plaintiff has made and continues to make these partial payments as she agreed to do.  In her case, the interest-free payment plan to which she has agreed is roughly equivalent to a 25% reduction of the charges for her care.[1]

6.      Alternatively, Mercy will often elect as part of its pre-suit collections process to offer the patient a significant reduction and/or partial write-off of her outstanding balance in exchange for her prompt payment of the reduced amount as a lump sum payment.

---

[1] Plaintiff alleges that her balance sent to collection was $11,363.  Assuming the statutory interest rate in Florida, currently 6% per annum, the present value of $11,363 paid at $100 per month over 113 months is roughly $8,500, which represents a 25% reduction.

3

Case No. 05-22409-Civ-Seitz/McAliley

Mercy's billing records that I have personally reviewed confirm that the Plaintiff was offered such a reduction and/or partial write-off, but refused this alternative for reducing her charges in favor of the partial payment plan described above, which she accepted instead.

7.    Mercy's patient records confirm that the Plaintiff did not indicate to Mercy at the time of her admission or at any time that she was uninsured, and instead claimed at the time of admission, on her initial patient intake form, and afterwards that she had insurance. Thus, she was not considered for Mercy's charity care program, nor did she submit the requisite financial information to be considered for this program.  Even so, Mercy voluntarily presented her with the above alternatives to reduce the charges that she owes to Mercy, and to my understanding and based on my review of Mercy's billing records, the Plaintiff has accepted the favorable interest-free payment plan that Mercy offered her.

AFFIANT SAYS NOTHING FURTHER.

_____
DAVID KEEBLER

MIAMI-DADE COUNTY      )
                       )  ss:
STATE OF FLORIDA       )

Before me, the undersigned notary, on this 2⁰ day of September, 2005, appeared David Keebler, who is personally known to me or produced his Florida's driver's license with photograph as proof of his identity, and executed the foregoing affidavit under oath.

_____
Notary Public, State of Florida
My Commission Expires:

